**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**
**(Bridgeport)**

| | | |
|---|---|---|
| THE CADLE COMPANY | ) | |
| Plaintiff, | ) | CIVIL ACTION |
| | ) | |
| vs. | ) | MASTER DOCKET NO. |
| | ) | 3:00 CV-00316 (WWE) |
| | ) | |
| GRACE JONES | ) | PLEADING APPLICABLE TO: |
| | ) | 3:00 CV-00316 (WWE) |
| Defendant. | ) | 3:00 CV-00317 (WWE) |
| | ) | |
| | ) | |
| THE CADLE COMPANY | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| DOROTHY MURREN, | ) | |
| | ) | |
| Defendant | ) | |
| | ) | FEBRUARY 12, 2004 |

**PLAINTIFF'S POST-TRIAL MEMORANDUM (INCLUDING OPPOSITION TO
DEFENDANTS' MOTION FOR RECONSIDERATION)**

I.      **Introduction.**

The Plaintiff, The Cadle Company ("Cadle" or "Plaintiff"), hereby submits its Post-Trial

Memorandum to assist the court in deciding these two consolidated civil actions.  Plaintiff also

hereby opposes Defendants' Motion for Reconsideration dated October 10, 2003.  The claims

against the two defendants in these two actions are similar in many, but not all, respects. This memorandum, therefore, is an omnibus brief directed to both cases. Matters of fact and evidence, to the extent that they bear on one but not both cases, will be notated for the court herein.

The parties entered into an extensive stipulation of facts, including the introduction into evidence of all documents affixed to the stipulation (which is contained within the Joint Trial Management Report dated October 2, 2003 and is hereinafter referred to as the "Stipulation"). Thus, most of the material facts are not in dispute. The dispute surrounds only a few issues of material fact and the legal significance of the facts.

Defendants' motion for reconsideration pertains to the court's rulings dated March 13, 2003 (denying their motions to dismiss plaintiff's fourth count) and dated June 24, 2003 (granting plaintiff's motions to strike three of their four affirmative defenses). The court has now twice reviewed and ruled upon the issues raised in those motions, but the defendants seek reconsideration because of an unreported district court decision that they claim cannot be reconciled with the court's rulings. Plaintiff opposes reconsideration on grounds of the law of the case, as well as substantively, as the three stricken affirmative defenses are legally insufficient.

For the reasons set forth more fully herein, the motion for reconsideration should be denied or, if granted, the court should adhere to its initial decisions (twice made) on substantive grounds, and judgment should enter in favor of the Plaintiff and against each of the Defendants for the full amount of the outstanding judgment debt (see paragraph 12 of Stipulation for the judgment amount – currently the sum of $240,179.23 as of February 12, 2004).

**II.     The Motion for Reconsideration Should be Denied or, if Granted, the Court, on Reconsideration, Should Adhere to its Initial Decisions, Twice Made, on The Issues Therein Presented.**

Defendants seek reconsideration by the court of its rulings on their motions to dismiss and plaintiff's motions to strike.  In their motions to dismiss, and in their opposition to the Plaintiff's motions to strike, the Defendants contended that the Connecticut Uniform Fraudulent Transfer Act, Conn. Gen. Stat. Sec. 52-552a et seq. ("CUFTA"), supplanted Plaintiff's cause of action for the imposition of a constructive trust or, alternatively, that the constructive trust claim is barred by one of two statutes of limitation (either the statute of limitations under CUFTA or for torts generally).  The Plaintiff maintained, and the court in its rulings concurred, that CUFTA does not supplant a common law constructive trust claim, that a constructive trust claim is specifically recognized under the common law of this state and has its underpinning in the uniquely equitable doctrine of unjust enrichment.  For those reasons the court further opined in those rulings that, as a purely equitable proceeding, the constructive trust claim is not governed

by any statute of limitations but, instead, the doctrine of laches is applied by the court to determine whether the equitable claim is stale.  Accordingly, the court denied the motions to dismiss (see rulings dated March 13, 2003) and granted plaintiff's motions to strike (ruling dated June 24, 2003).

The plaintiff will not regurgitate herein its three briefs on those two motions, but instead respectfully refers this honorable court to those memoranda for the points, authorities and arguments therein (see, memorandum of law in opposition to motion to dismiss dated February 11, 2003, memorandum of law in support of motion to strike dated May 2, 2003, and reply brief in support of motion to strike dated May 29, 2003).  Those briefs collectively establish the following: (1) that the fourth count for the imposition of a constructive trust under the common law is not supplanted by CUFTA; (2) that the fourth count is a separate and distinct equitable cause of action (not just an equitable remedy) that has its legal underpinning in the uniquely equitable doctrine of unjust enrichment; and (3) that the fourth count, being an equitable cause of action, is not governed by any statute of limitations and that its timeliness, *vel non*, is determined solely by the doctrine of laches.  Accordingly, Plaintiff addresses herein Defendants' claim of a conflicting district court ruling as well as the U.S. Supreme Court case cited as authority by that brother court.

The case of <u>Stefancin v. The Nevada Club</u>, No. 3:02 CV 1299 (AVC), is relied upon by the Defendants as the basis for their motion for reconsideration.  This is an unpublished decision that is factually very different from the case *sub judice*.  The <u>Stefancin</u> plaintiff was a *pro se* litigant who, in 2002, sued a Nevada casino in district court with respect to gambling losses suffered by her former husband twenty-five years before the suit was commenced.  The court dismissed the case on statute of limitations grounds.  The court noted that the plaintiff "failed to articulate any specific cause of action" in her complaint, but the court "liberally construed" the complaint as sounding in common law fraud and unjust enrichment (the latter, impliedly so).  The <u>Stefancin</u> court determined, from the review of the complaint, that the plaintiff therein pursued a singular action for fraud on both equitable and legal grounds, and determined that pursuit of both a claim at law and in equity on the common facts called for application of the statute of limitations for the legal claim to the equitable claim.  The court relied upon <u>Russell v. Todd</u>, 309 U.S. 280 (1940), for that principle.[1]

The <u>Russell</u> case is not controlling legal precedent, even though it is a U.S. Supreme Court decision.  This is so because, as the case itself states, it was decided based on the equity

---

[1] It should be noted that the foregoing proposition for which the Defendants have cited <u>Stefancin</u> is one that was not even briefed by the defendant who moved to dismiss the complaint, but apparently was raised by the court, *sua sponte*.  See, <u>Stefancin</u> defendant's memorandum of law attached hereto.  The proposition also appears at the tail end of the opinion after a lengthy analysis as to why the court basically had already decided to dismiss the case.

jurisdiction of federal courts when they are not sitting in diversity jurisdiction, which is based on

the Judiciary Act of 1789, 28 U.S.C. Sec. 725. Id. at 287.  However, even if this court were to

follow the holding of Russell, the result would favor the Plaintiff, not the Defendants.

> [W]here the equity jurisdiction is exclusive and is not exercised in aid or support of a legal right, state statutes of limitations barring actions at law are inapplicable, and in the absence of any state statute barring the equitable remedy in like cases, the federal court is remitted to and applies the doctrine of laches as controlling.  …The present suit being, as we have seen and as the court below held, exclusively of equitable cognizance, in that it is not predicated upon any legal cause of action, the statute is not one which a federal court of equity will adopt and apply as a substitute for or a supplement to its own doctrine of laches, unless it is applied to like causes of action in the state courts.

Id. at 289-90.

The fourth count is exclusively equitable and is not exercised in aid or support of a legal

right.  It is not predicated upon any legal cause of action and is instead exclusively of equitable

cognizance.  This is made evident by the nature of the constructive trust claim and its

underpinnings being firmly planted in the uniquely equitable doctrine of unjust enrichment.

See, Wendell Corp. Trustee v. Thurston, 239 Conn. 109, 113-14, 680 A.2d 1314 (1996); Cohen

v. Cohen, 182 Conn. 193, 202-03, 438 A. 2d 55 (1980); Gagne v. Viccaro, 255 Conn. 390, 409

(2001); and Cadle Co. v. Gabel, 69 Conn. App. 279, 281-293, 794 A.2d 1029 (2002).[2]   There is

---

[2] The Fourth Count is a cause of action for the imposition of a constructive trust.  It is recognized as its own cause of action, not merely a remedy, and it has its roots in the equitable doctrine of unjust enrichment.  Wendell Corp. Trustee v. Thurston, 239 Conn. 109, 113-14, 680 A.2d 1314 (1996); Cohen v. Cohen, 182 Conn. 193, 202-03, 438 A. 2d 55 (1980).  If one were to look to

no parallel legal claim being pressed with respect to the facts and circumstances comprising the constructive trust claim; nor does such a parallel claim at law exist.  The other three counts deal strictly with fraudulent transfers of income and property within the four years preceding the commencement of the case.  The constructive trust claim is not a suit about fraudulent transfers at all; rather, it is a suit about equitable ownership of property by the Plaintiff's debtors (the husbands of the Defendants) where bare legal title to that property rests in the Defendants.  The Plaintiff is asking the court to exercise its equitable power to look behind the legal fiction of title, to the reality of the financial and economic situation, where the Plaintiff's debtors exercise all indicia of ownership over the assets in question but for legal title, such that they truly are the equitable owners of the property.  In such a circumstance, equity and good conscience cannot permit the concept of legal title to preclude the Plaintiff from reaching the property (and/or the proceeds thereof) and applying the same towards the satisfaction of the equitable owner's judgment debt to the Plaintiff.  Such a claim, which is the constructive trust claim in a nutshell, is a very different critter from a suit at law to set aside a fraudulent transfer.  One focuses on the

unjust enrichment as the theoretical underpinning constituting the cause of action for the imposition of a constructive trust, the law in this state is clear that "a right of recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another."  Gagne v. Viccaro, 255 Conn. 390, 409 (2001).  Thus, the "cause of action" here is either one for the imposition of a constructive trust, or one founded upon the equitable doctrine of unjust enrichment, as a consequence of which a constructive trust should be imposed.

singular event of a transfer; the other focuses on the economics of a family's financial structure over time and the reality of equitable ownership of assets (based upon all of the indicia of ownership other than legal title), with equity refusing to pay homage to the fiction of bare legal title to the detriment of the Plaintiff, and the unjust enrichment of the holder of legal title.

With all due respect to the Defendants, the court got it right each of the first two times that it ruled on these issues. A third bite at the proverbial apple is not warranted and the law of the case should control.[3]

### III.    The Plaintiff Proved its Constructive Trust Count (Fourth Count) Against Both Defendants, and, Accordingly, a Constructive Trust Should Be Imposed.

#### A.  Facts.

The bulk of the facts that are material to the outcome of this entire case have been established and are set forth in the Stipulation, which Stipulation of facts and exhibits is contained in the joint trial memorandum that is part of the evidentiary record in this case. The Stipulation contains 139 paragraphs of stipulated facts and 23 Exhibits (numbered Exhibits 100

---

[3] The law of the case doctrine "posits that if a court decides a rule of law, that decision should continue to govern in subsequent stages of the same case. Courts apply the law of the case doctrine when their prior decisions in an ongoing case either expressly resolved an issue or necessarily resolved it by implication." Aramony v. United Way of America, 254 F.3d 403, 410 (2000). This rule is discretionary in its application; it does not bind the court to adhere to its prior ruling. Id.

through 122, inclusive) appended to the Stipulation that constitute evidence in the case.  Beyond that, there was the testimony of legally hostile witnesses (the defendants, their spouses and the daughter of one of the couples), the testimony of plaintiff's account officer, and two additional exhibits beyond those stipulated to, Exhibits 129 and 130, that collectively comprise the evidence bearing on the case.

The portion of the stipulated facts bearing on the fourth count of the two complaints are paragraphs 1-6 (general matters), paragraphs 7-16 (Plaintiff's judgment and the judgment debtors' insolvency), paragraphs 17-31 (the Murphy & Murphy Insurance Agency and transactions related thereto), paragraphs 32-49 (the Van Zant Street Condominium and transactions pertaining thereto), certain portions of paragraphs 50-82 (banking and financial transactions of the Joneses), certain portions of paragraphs 83-127 (banking and financial transactions of the Murrens), and certain portions of paragraphs 128-139 (miscellaneous matters).  The fourth count is essentially broken down into three discrete sets of facts and circumstances, with each of them overlaid with the difficult financial circumstances of the Defendants' spouses, who are the Plaintiff's debtors, leading to a picture of a comprehensive scheme whereby the Defendants hold legal title to assets that are in reality and equitably owned by Plaintiff's judgment debtors.  Those three sets of facts and circumstances are: (1) the Van

Zant Street Property; (2) Murphy & Murphy Insurance Agency and transactions related thereto; (3) and the Defendants' respective marital homes.

### 1. The Van Zant Street Property.

There are eighteen paragraphs of stipulated facts bearing specifically on this part of the fourth count (paragraph nos. 32-49 of the Stipulation) and ten exhibits (Exhibit nos. 106-115, inclusive, affixed to the Stipulation). In addition, testimony was given by each of the Defendants, each of their respective husbands and the daughter of the Joneses, Ms. Stacey Schlubach. A copy of the transcript of their testimony is on record with this court.

The salient facts can be summarized as follows: The Van Zant Street Property, also known as the Office Condominium, housed the Murphy & Murphy insurance agency from approximately 1986 until August of 2000. The property was acquired in 1986 by J&M Associates, a partnership between William Jones and Thomas Murren, as general partners, for the sum of $700,000.00. In 1987, the property was encumbered by a $600,000.00 mortgage, which mortgage eventually went into default and, in June of 1992, a foreclosure action of the mortgage was commenced. The mortgage loan was sold during the pendency of the foreclosure action and, in the spring of 1994, William Jones and Thomas Murren struck a deal with the new owner of the mortgage loan to settle the foreclosure action and the mortgage indebtedness underlying the same at a deep discount, for the sum of $112,500.00, a savings of over

$500,000.00.  At this time William Jones and Thomas Murren were facing serious financial difficulties arising from debts they owed to a number of creditors.  They owed creditors collectively in excess of $2,000,000.00 and were in default of their various obligations.  They both were then insolvent, and remained so until their respective bankruptcy discharges in October of 2000.

William Jones and Thomas Murren wanted to seize this opportunity to extract the Van Zant Street property from the foreclosure action and the sizeable mortgage debt, but decided that they could not hold legal title, directly or indirectly (i.e., through ownership of a company) without having the property exposed to being reached and applied by their creditors.  Therefore, they caused a Connecticut limited liability company to be formed, JoMur Associates, LLC, and placed ownership of the company in the name of Defendant Dorothy Murren (Thomas' wife) and Stacey Schlubach (William Jones' daughter who had worked for her father at Murphy & Murphy for many years, was very close to her father and who, by her own admission, would do anything that her father asked of her, short of committing murder).  William Jones was well aware of the closeness of his relationship with his daughter and of her ready willingness to abide by his wishes.  Dorothy Murren and Stacey Schlubach each thus became holders of 50% of JoMur Associates, LLC (and collectively held 100% of the membership interests in the company).  Thomas Murren was made the manager of the limited liability company and was vested with

plenary authority to deal with the sole asset of the company, the Van Zant Street property that was being acquired by JoMur Associates, LLC.

The settlement with the mortgage holder was consummated in a transaction whereby: (a) JoMur Associates, LLC borrowed $100,000.00 from a finance company pursuant to a loan commitment that required Messrs. Jones and Murren each to personally guaranty the $100,000.00 loan (which they in fact did); (b) that $100,000.00 plus another $12,500.00 from the coffers of Murphy & Murphy, P.C. (Messrs. Jones' and Murren's insurance agency) was tendered to the foreclosing mortgagee in exchange for a release of the $600,000.00 mortgage on the property, a withdrawal of the foreclosure action and a discharge of the lis pendens; and (c) Messrs. Jones' and Murren's partnership that owned the property, J&M Associates, conveyed the property to JoMur Associates, LLC, which company executed and delivered a mortgage deed to the takeout financier to secure the $100,000.00 loan.

Dorothy Murren did not know that she had an ownership interest in JoMur Associates, LLC (fifty percent or otherwise). In fact, she had never heard of JoMur Associates, LLC, until her deposition was taken in 2002, and she theretofore had believed that Murphy & Murphy owned the Van Zant Street property from the time when Murphy & Murphy moved into it 1986 until sometime in 2000 when the building was sold proximate in time to the sale of the insurance agency itself. Dorothy Murren was also wholly unaware of the financial circumstances with

respect to the property; she had never known that the building was in foreclosure or that there was a refinance and conveyance transaction whereby the men resolved the debt troubles of the property.

In 1994, Stacey Schlubach was told by her father that he was giving her a one-half interest in the Van Zant Street property.  At the time when she so acquired a one-half interest in JoMur Associates, LLC, Stacey Schlubach had no idea of any of the circumstances surrounding the then-current ownership of the property, did not know who then-owned the property, had no idea of the financial condition of the property – of the delinquent $600,000.00 mortgage in foreclosure, the deep discount settlement offer or any other fact, matter or event relating to the property.  She had no idea that she was playing a critical role in her father's and Mr. Murren's extraction of the property from financial difficulty and foreclosure, and that the extraction transaction was being structured so as to remove the property from the reach of Messrs. Jones' and Murren's creditors.

Neither Stacey Schlubach nor Dorothy Murren paid anything of value in exchange for the "acquisition" of their respective 50% membership interests in JoMur Assocites, LLC.  Neither of them had anything to do with the management or operation of the property.  In fact, there never was a written lease for the property between Murphy & Murphy, as tenant, and JoMur Associates, as landlord.  Instead, Messrs. Jones and Murren just structured the lease payments so

that they would meet the debt service and tax payments, their estimation for which usually left a little something extra each year that was paid to Stacey and Dorothy.

Such remained the status quo for the Van Zant Street property until early 2000 (nearly six years later), when Messrs. Jones and Murren found a buyer for the property at the contract price of $480,000.00. Neither Stacey Schlubach nor Dorothy Murren were involved in the decision to offer the property for sale, to sell the property or on what terms the property would be sold. They were merely informed of matters as a *fait accompli*. Moreover, at or near the time when a buyer had been found for the property, Stacey was informed that the property was going to be sold and her father, William Jones, asked her to transfer 75% of her membership interest in JoMur Associates, LLC to her mother, Defendant Grace Jones. Stacey readily complied and, for no value (other than her mother's agreement to be bound by the operating agreement), Stacey Schlubach transferred 75% of her membership interest in JoMur Associates, LLC to Defendant Grace Jones on March 8, 2000. Within a few short weeks thereafter, a formal purchase and sale agreement between JoMur Associates, as seller, and the buyer of the property was entered into for the aforesaid sum of $480,000.00.

Grace Jones, until her deposition was taken late in 2002, believed that Murphy & Murphy had owned the Van Zant Street property from the time when it first moved in there until shortly before the insurance agency itself was sold. She was totally unaware of the financial difficulties

and circumstance relating to the property, the resolution of those problems (through the transactions above-described) or of any matter, fact or event relating to the property, other than the fact that the property ultimately was sold and vacated proximate in time to when the insurance agency itself was sold. She never was aware that her daughter ever held a 50% interest in an entity that owned the property, that 75% of that interest was transferred to her, or that she received over $146,000.00 in connection with the ultimate sale of the property (she claimed to have no knowledge as to the source of the $146,000.00 payment).

When the contract closed in August of 2000, the net proceeds of the sale were disbursed as follows: $195,820.78 to Dorothy Murren, $146,865.58 to Grace Jones and $48,955.26 to Stacey Schlubach. Dorothy Murren's check went into the brokerage account that Thomas Murren opened in her name (he managed all of the family finances) and which was at his disposal. Grace Jones' check went into the checking account titled in her name that is utilized by the couple for their use in their common life together.

Messrs. Jones and Murren have been insolvent since 1992 and remained so through and including the time when they filed their bankruptcy petitions and received their bankruptcy discharges, and they have no meaningful assets titled in their name.

The Plaintiff took examinations of judgment debtors of both William Jones and Thomas Murren in early 2000. Both judgment debtors testified that the Van Zant Street property was

bought by them as J&M Associates for approximately $700,000.00, was mortgaged by them and later foreclosed, and then repurchased from the people who foreclosed the mortgage; that the repurchasing entity was JoMur Associates, which was owned by Dorothy Murren and Stacey Schlubach, and that JoMur Associates financed the purchase of the property from the foreclosing mortgagee.  Thus, in their debtor's exam, the judgment debtors misrepresented the disposition of the property in connection with the foreclosure action, leading the Plaintiff to believe that the foreclosing mortgagee divested their partnership of legal title to the property, acquiring the property itself, and thereafter re-sold the property to JoMur Associates.  William Jones went so far as to claim no real knowledge about any of the particulars of that transaction, claiming that he was not involved in it.  Alas, both Messrs. Jones and Murren were intimately involved in that transaction, as they engineered it and guaranteed the "take out" financing and effectuated the conveyance of the property to JoMur Associates directly from their partnership.

     2**. The Murphy & Murphy Insurance Agency and Transactions Relating Thereto.**

     There are fifteen paragraphs of stipulated facts bearing specifically on this part of the fourth count (paragraph nos. 17-31 of the Stipulation) and six exhibits (Exhibit nos. 100-105, inclusive, affixed to the Stipulation).  In addition, testimony was given by each of the Defendants and each of their respective husbands.  The salient facts can be summarized as follows: The Defendants respective spouses, Messrs. Jones and Murren, have been insurance brokers in the

insurance business together for many years.  As of a point in time not later than the early to mid-1980s, Messrs. Jones and Murren jointly owned, operated, managed and directed Murphy & Murphy, P.C.  They each held 50% of the outstanding stock in Murphy & Murphy.

As early as 1990 Messrs. Jones and Murren had serious debt troubles, being indebted to creditors in excess of $2,000,000.00, and which indebtedness was substantially greater than the individual and collective value of their assets.  The Plaintiff's assignor commenced suit against Messrs. Jones and Murren on their defaulted loan in 1991, went to judgment against them in 1992 and, in March of 1994, assigned the judgment to the Plaintiff.

On September 1, 1994, a few short months after Messrs. Jones and Murren engineered the transaction that extracted the Van Zant Street property from its foreclosure action and heavy debt burden, and caused that property to be conveyed to JoMur Associates, LLC (all as aforesaid), they continued to have heavy debt problems and, out of a concern that one or more creditors might endeavor to reach and apply their interests in Murphy & Murphy towards their outstanding debts, they each transferred legal title to their fifty percent ownership of the stock of Murphy & Murphy to their respective wives, the Defendants, for no consideration.  After the transfer of legal title, just as before, Messrs. Jones and Murren continued to run the company, and together they alone operated, managed and directed the business and affairs of Murphy & Murphy.  After the transfer of legal title, just as before, Messrs. Jones and Murren received

annual remuneration from Murphy & Murphy at a level roughly equal to the monies available for distribution after business expenses and staff salaries were paid, with each receiving approximately the same amount of remuneration as the other.

From and after the 1994 stock transfers, and up until just before the March 2001 transaction in which the business of Murphy & Murphy was sold to J.M. Layton, the Defendants never received any distributions of dividends, profits or any other payment for or as a result of their shareholdings in Murphy & Murphy, and neither of them received any significant remuneration from Murphy & Murphy during that time period.  In fact, Defendant Grace Jones was never involved in the business of Murphy & Murphy to any extent at all, and Defendant Dorothy Murren never had any meaningful involvement in the business – she never did more than provide a negligible amount of filing and cleaning help from time to time.

Defendant Grace Jones, until her deposition in late 2002, was not even aware that she held legal title to any interest in Murphy & Murphy.  Indeed, up until that point in time, she had thought Murphy & Murphy was a partnership owned, operated and managed jointly by her husband and Mr. Murren.  Dorothy Murren thought that, at sometime in the past she might have received a transfer of a part of her husband's interest in Murphy & Murphy, but she erroneously believed that he retained legal title to some shares of stock in the company.

Defendants are not and never have been licensed insurance agents or brokers, and both of

them lack the knowledge, experience and skill with which to conduct the business of an insurance agency.  Neither of them have any knowledge of the business affairs of Murphy & Murphy; nor do they have the ability to compete in the business of insurance.

In late 2000 and early 2001, Messrs. Jones and Murren negotiated an agreement, dated as of January 1, 2001, by which J.M. Layton agreed to purchase all of the assets of Murphy & Murphy, entered into a non-competition agreement with Murphy & Murphy, William Jones, Grace Jones, Thomas Murren and Dorothy Murren, and entered into employment agreements with William Jones and Thomas Murren.  In March of 2001, the parties to that agreement closed on the transaction.  The agreement for the sale of the Murphy & Murphy assets to J.M. Layton provided for an allocation of the purchase price to said assets, and as a result of said sale and allocation, Defendants Grace Jones and Dorothy Murren each received a $100,000.00 distribution from Murphy & Murphy in March 2001, which distributions were paid to them by checks in the amount of $100,000.00 each.   Dorothy Murren's $100,000.00 check, Exhibit 105, went into the aforesaid brokerage account (at PaineWebber) that Mr. Murren set up and oversees (as the financial administrator of their household).  Grace Jones' $100,000.00 check, Exhibit 104, went into her aforesaid household account at Chase Manhattan Bank.  In addition to that lump-sum remuneration, each of the Defendants is receiving jointly with their respective husbands, the sum of $5,000.00 per month for 72 months, from and after January 1, 2001 for said

six-year period of time, for a total joint payout per couple of $360,000.00 from those monthly payments.

     3**. The Defendants' Respective Marital Homes.**

     **a. The Joneses' Home.**

There are thirty-three paragraphs of stipulated facts bearing specifically on this part of the fourth count (paragraph nos. 50-82 of the Stipulation) and two exhibits (Exhibit nos. 116-117, inclusive, affixed to the Stipulation), in addition to the general matters (paragraph nos. 1-6), Plaintiff's judgment and judgment debtors' insolvency (paragraph nos. 7-16) and the miscellaneous matters (paragraph nos. 128-139), and the exhibits referred to in those sections of the Stipulation. In addition, testimony was given by each of the Defendants and each of their respective husbands.

The salient facts can be summarized as follows:

Ever since 1987, Grace Jones and William Jones have lived at 121 Lakewood Drive, Fairfield, Connecticut (the "Fairfield Property"), in which year the Fairfield Property was purchased by them for the sum of $500,000.00. Title to the Fairfield property was initially acquired on April 2, 1987 in the names of Grace Jones and William Jones, as joint tenants with right of survivorship. In 1990, William Jones and Thomas Murren were both indebted to their creditors for in excess of $2,000,000, and which indebtedness was substantially greater than the

individual and collective value of their respective assets and those of the other parties with whom they were jointly and severally liable on said debt (and thus the two men were insolvent in 1990). The indebtedness that is the subject matter of the Great Country Suit was a part of this outstanding indebtedness.  On or about July 25, 1990, William Jones executed and delivered a quitclaim deed to and in favor of Grace Jones, with respect to his interest in the Fairfield Property.  No present consideration of money or property was given for said transfer.  At all times from and after July 25, 1990, defendant Grace Jones alone has held legal title to the Fairfield Property.

William Jones was insolvent (as the term "insolvent" is defined by Connecticut General Statutes Section 52-552c(a)) from February 3, 1992 through July 14, 2000.  Such insolvency of William Jones had been continuous throughout this entire period of time.  William Jones filed a bankruptcy petition in the U.S. Bankruptcy Court on July 14, 2000 and was granted a discharge in bankruptcy on October 31, 2000, which discharge included the discharge of his *in personam* liability for the debt represented by the Great Country Judgment.

William Jones received a weekly salary from Murphy & Murphy, which salary was paid weekly, fifty-two weeks per year, at all times material to this litigation, including, but not limited to, January 1, 1992 through and including July 14, 2000, which weekly salary so received by William Jones throughout that period of time was not less than the sum of $1,339.00.  From prior

353455                                          21

to the Great Country Judgment, through and including March 24, 1997, defendant Grace Jones

and William Jones had a joint bank account (a checking account) with The Chase Manhattan

Bank, checking account number 528-1-024132 (the "Joint Chase Account").  From prior to the

Great Country Judgment through and including February 25, 1997, William Jones's weekly

salary (not less than $1,339.00) from Murphy & Murphy was direct deposited into the Joint

Chase Account.  On February 26, 1997 a new checking account was created at The Chase

Manhattan Bank, checking account number 526-0000056-65, in the name of Grace Jones alone

(the "Grace Jones Checking Account"), on which account Grace Jones was the sole owner and

only person authorized to make withdrawals or write checks.  From the point in time of its

creation on February 26, 1997, through and including January 1, 1999, William Jones no longer

had his weekly salary direct deposited into the Joint Chase Account and, instead, received

weekly a physical paycheck in the amount of $1,341.00, which weekly check William Jones

would promptly transfer to Grace Jones and Grace Jones would deposit in the Grace Jones

Checking Account.

On February 12, 1999, the Fairfield Property was re-financed, the then-existing mortgage

loan was paid off (and the mortgage released) and the Fairfield Property then became

encumbered by a single mortgage loan in the amount of $245,000.00.  From at least before

February 1, 1992, up to the day immediately preceding the aforesaid refinance (February 11,

1999), fixed mortgage payments with respect to the mortgage on the Fairfield Property were paid bi-weekly (for twenty-four payments per year), each such bi-weekly payment being in the amount of $1,376.00. The mortgage company did not escrow for real property taxes. From February 1, 1992, through and including February 25, 1997, the aforesaid bi-weekly mortgage payment was paid by means of a direct debit by the mortgage company of the Joint Chase Account. From February 1, 1992 through and including February 25, 1997, ninety-five (95) percent of the total dollar amount of the aforesaid mortgage payments and real property tax payments were made with funds representing William Jones' weekly salary from Murphy & Murphy. Therefore, the aggregate total of mortgage payments made by William Jones from the date of the judgment, February 3, 1992, through February 25, 1997, a period of 5 years and 3 weeks (or 121 bi-weekly payments), is the sum of $166,496.00 x .95, the sum of $158,171.20.

On or about January 1, 1999, William Jones and Grace Jones set up a joint checking account at First Federal Credit Union (the "First Federal Joint Account"). From on or about January 1, 1999 through and including July 14, 2000 William Jones had his weekly salary from Murphy & Murphy direct deposited into the Federal Joint Account. During the period from January 1, 1999 through and including July 14, 2000, William Jones and Grace Jones had a tacit agreement whereby Grace Jones, promptly upon the crediting of the direct deposit of the weekly salary, would draw a check on the First Federal Joint Account, payable to her order, in the full

amount of the weekly salary, and deposit said check into the Grace Jones Checking Account. The aggregate sum of those paychecks so swept by Grace Jones is $107,280.00.    Grace Jones never gave any money or property of any kind to William Jones in exchange for this account sweeping arrangement whereby she received the proceeds of his weekly paycheck.

The plaintiff's appraisal evidence for the value of the Fairfield Property is Evidentiary Exhibit 116.  This appraisal is admitted in evidence as a full exhibit, by Stipulation, for the court to consider the contents and tenor thereof in lieu of expert testimony.  This appraisal shows that, from 1994 through 2000, the property increased in value from $455,000.00 to $555,000.00.  As of the commencement of this action, there was equity in this home in excess of $305,000.00 (based on the 1999 refinancing of the mortgage at a level of $245,000.00 and regular periodic payment of the mortgage thereafter).

After the closing of the Joint Chase Account in February of 1997, Grace Jones established a practice (which she continued through July 14, 2000) of paying the so-called "household bills" from the moneys in the Grace Jones Checking Account account, ninety-five percent of which moneys constituted funds from the salary William Jones received from Murphy & Murphy.  William Jones understood and consented to that practice.  Said "household bills" include, but are not limited to, the insurance premiums, heating and utility bills, maintenance and repairs of the Fairfield Property.

Ever since the Joneses moved into the Fairfield Property in April of 1987, William Jones has had unfettered and uninterrupted access to, use, occupancy and enjoyment of the entirety of the Fairfield Property as his sole residence with his wife, Grace Jones.  For the period from at least October 1994 through July 14, 2000, other than the Joint Chase Account and the First Federal Joint Account, William Jones has no meaningful financial assets/investments titled in his name.  Plaintiff's judgment debt remains wholly unpaid.

Throughout the time period of February 1, 1992 through and including July 14, 2000, neither Grace Jones nor Dorothy Murren was gainfully employed for any materially significant economic remuneration.  Defendants Grace Jones and Dorothy Murren were, for all intents and purposes, supported financially by their husbands, William Jones and Thomas Murren, respectively.

**b.  The Murren's Connecticut Residence and Vermont Vacation Home.**

There are forty-five paragraphs of stipulated facts bearing specifically on this part of the fourth count (paragraph nos. 83-127 of the Stipulation) and two exhibits (Exhibit nos. 118-119, inclusive, affixed to the Stipulation), in addition to the general matters (paragraph nos. 1-6), Plaintiff's judgment and judgment debtors' insolvency (paragraph nos. 7-16) and the miscellaneous matters (paragraph nos. 128-139), and the exhibits referred to in those sections of the Stipulation.  Plaintiff respectfully refers the court to the Stipulation for such facts.

B.    **Law and Argument.**

Plaintiff maintains under the Fourth Count, as to both Defendants, that on the facts proven it offends equity and good conscience for the Defendants, Dorothy Murren and Grace Jones, to enjoy and retain unfettered ownership of their respective residential properties and the products and proceeds of the sale of the assets of Murphy & Murphy, the remuneration on the covenant not to compete and the proceeds from the sale of the Van Zant Street property, especially where, as here, William Jones and Thomas Murren had no meaningful assets in their names, each filed a bankruptcy petition and was discharged in bankruptcy. The Fourth Count further alleges that, by reason of the foregoing, the Defendants have engaged in conduct that has wrongfully harmed the Plaintiff and have been unjustly enriched to the detriment of the Plaintiff. The Plaintiff further alleges that by reason of the foregoing, Plaintiff may, by this proceeding in equity, hold the Defendants personally liable to the Plaintiff for the amounts of her improper financial gains, all as aforesaid described, to the extent of the outstanding balance of Plaintiff's judgment against William Jones and Thomas Murren. Plaintiff thus alleges that a constructive trust should be imposed upon the properties and other assets of the Defendants, and that the Defendants should be required to hold the same for the benefit of the Plaintiff.

The Connecticut Supreme Court recognizes constructive trust claims as a common law equitable proceeding. Wendell Corp. Trustee v. Thurston, 239 Conn. 109, 113-14, 680 A.2d

1314 (1996); <u>Cohen v. Cohen</u>, 182 Conn. 193, 202-03, 438 A. 2d 55 (1980).  Indeed, in the very context of a creditor seeking to impose a constructive trust against the assets of the non-debtor spouse where, as here, the debtor transferred legal title to the assets to his spouse but nonetheless retained an equitable ownership interest in the transferred assets, there is a decision of the Connecticut Appellate Court on point.  <u>Cadle Co. v. Gabel</u>, 69 Conn. App. 279, 281-293, 794 A.2d 1029 (2002).  The <u>Gabel</u> court specifically recognized an equitable constructive trust proceeding under the common law, and upheld a notice of lis pendens by virtue of probable cause on the constructive trust count alone.  <u>Id</u>.  In so ruling, the Connecticut Appellate Court specifically endorsed the same legal theory advanced in the Fourth Count (on arguably more difficult facts than the ones here presented).

A constructive trust arises contrary to intention and in invitum, against one who, by fraud, actual or constructive, by duress or abuse of confidence, by commission of a wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy . . . . a constructive trust arises whenever another's property has been wrongfully appropriated and converted into a different form . . . or when a person who holds title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it.  A trial court's determination that the imposition of a constructive trust is an appropriate remedy must stand unless it is clearly erroneous or involves an abuse of discretion.

<u>Cadle Co. v. Gabel</u>, 69 Conn. App. 279, 288 (2002); accord, <u>Wendell Corp. Trustee v. Thurston</u>, 239 Conn. 109, 113-14 (1996).

The legal theory of a debtor-transferor's retention of equitable ownership in transferred assets also has support in a number of federal cases outside of this district and also in one Second Circuit decision. These cases are factually similar to the Fourth Count. The *sine qua non* of these decisions is not the transfer, *per se*, but the conclusion that the transferor-debtor attempted, through a sham transfer of legal title, to shield an equitable interest in the property that he retained after the transfer, such that the transferor-debtor was and continued to be the equitable owner of the "transferred" asset. See, e.g., In re: Kaiser, 32 B.R. 701 (Bankr. S.D.N.Y. 1983), affd, 722 F.2d 1574 (2d Cir. 1983) (court denied the debtor a discharge, due to his fraudulent concealment of an equitable interest in transferred property, and imposed a constructive trust on such property)[4]; In re: Gugliada, 20 B.R. 524 (Bankr. S.D.N.Y. 1982) (court sustained objection to discharge due to debtor's fraudulent concealment of equitable interest retained in assets to which he transferred legal title); In re: Vecchionne, 407 F. Supp. 609 (E.D.N.Y. 1976) (same); In re: Elliot, 83 F. Supp. 771 (E.D. Pa. 1948) (same, and opining that constructive trust may be imposed).

> At the time the bankrupt's wife took title to the property, a suit for damages was pending against her husband. Although she made the initial payment on the property, it is quite apparent that at that time she could not pay the installments on the mortgage as they became due without the financial assistance of her husband. As was to be expected, his funds were used to that end. Consequently, subject to

---

[4] In re: Kaiser was decided under New York's fraudulent conveyance statute (but nonetheless is demonstrative of the culpability of this type of conduct.

her equity therein, the bankrupt's wife holds the property upon a constructive trust
for his creditors.

In re: Elliot, 83 F. Supp. at 773; accord, In re: Gugliada, 20 B.R. at 531-33 (collecting cases); see

also, In re: Kaiser, 722 F. 2d 1574, 1583-84 (2d Cir. 1983); In re: Kaiser, 32 B.R. 701 (Bankr.

S.D.N.Y. 1983); and In re: Vecchionne, 407 F. Supp. 609 (E.D.N.Y. 1976). Each of these cases

found such equitable ownership to exist where, as here, following the transfer of legal title to the

non-debtor spouse (or, in one or more cases, even where legal title is initially placed in the name

of the non-debtor spouse), the transferor-debtor was the one who supported the property (usually

the marital domicile) economically, such as by paying the mortgage obligation, property taxes

and other expenses of associated with owning and operating the property. Id.

> [E]vidence of [debtor-transferor's] fraudulent intent emerged from his practice of
> asserting and retaining rights of ownership in property purportedly transferred,
> and employing the property for his personal use and benefit. The trial record
> contains several examples of attempts by the debtor to place his property where
> he can still enjoy it and at the same time require his creditors to remain
> unsatisfied.

In re: Kaiser, 32 B.R. at 705.

> The transfer of property by the debtor to his spouse while insolvent, while
> retaining the use and enjoyment of the property, is a classic badge of fraud. The
> shifting of assets by the debtor to a corporation wholly controlled by him is
> another badge of fraud. The [debtor's] fact situation presents both badges of
> fraud. While insolvent, he purchased two homes with his own money, but had
> title to both placed in the name of his wife who provided no consideration for

> these transfers.  He continued to retain the possession, benefit and use of the
> properties and treated them as his own.  He created dummy corporations in order
> to hide his assets.  He concealed these assets in his petition for bankruptcy.  This
> scenario clearly indicates a scheme to defraud creditors.  [Debtor's] argument that
> the facts of this case do not fit the "prototype" of an intent to defraud case if
> factually incorrect and irrelevant.  Fraudulent acts are as varied as the fish in the
> sea.

In re: Kaiser, 722 F.2d at 1583.

In the same vein, the Gugliada court found equitable ownership resided with the debtor

where the debtor caused legal title to all of the stock in a company to be placed in the name of an

insider, but the debtor nonetheless controlled the company and ran it as his own business

enterprise.  In re: Gugliada, 20 B.R. at 532-33.  This is the essence of the claims of the Fourth

Count relating to the Murphy & Murphy stock (and the transactions related thereto) and the

claims of the Fourth Count relating to JoMur Associates and the office condominium (and the

transactions related thereto).

> The debtor appears to have a free hand in making decisions and overseeing the
> daily affairs of the company.  In short [the company] is a vehicle for the operation
> of the [debtor's] business.  The debtor appears to enjoy at least an equitable
> interest in a company that for all practical purposes is a family enterprise
> orchestrated by the debtor. . . . The debtor has retained equitable interests in the
> assets transferred to his wife, and it has been found that he holds an equitable
> interest in [the company], and is enjoying the benefits of these assets,
> notwithstanding that he is devoid of legal title.  These concealments were
> knowing and fraudulent.

Id.

It is clear that the Fourth Count stands on solid ground as to the culpability of the alleged conduct in the eyes of the law.

**IV.    The Fraudulent Transfer Claims Have Been Proven Against Defendant Grace Jones**

   **A.  Facts.**

   **1.        Facts bearing on Jones Fraudulent Transfer Counts.**

William Jones was insolvent (as the term "insolvent" is defined by Connecticut General Statutes Section 52-552c(a)) from February 3, 1992 through July 14, 2000.  Such insolvency of William Jones had been continuous throughout this entire period of time.  For the period from at least October 1994 through July 14, 2000, other than the Joint Chase Account and the First Federal Joint Account, William Jones had no meaningful financial assets/investments titled in his name.

On February 26, 1997, a new checking account was created at The Chase Manhattan Bank, checking account number 526-0000056-65, in the name of Grace Jones alone (the "Grace Jones Checking Account"), on which account Grace Jones was the sole owner and only person authorized to make withdrawals or write checks.  From the point in time of its creation on February 26, 1997, through and including January 1, 1999, (a period of 96 weeks) William Jones no longer had his weekly salary direct deposited into the Joint Chase Account and, instead,

received weekly a physical paycheck in the amount of $1,341.00, which weekly check William

Jones would promptly transfer to Grace Jones and Grace Jones would deposit in the Grace Jones

Checking Account.  The aggregate sum of those paychecks is $128,736.00.  On March 27, 1997,

the sum of $4,015.39, representing the then-balance of the Joint Chase Account, was transferred

into the Grace Jones Checking Account, effectively closing the Joint Chase Account.  Grace

Jones never gave any money or property of any kind to William Jones in exchange for his tender

of his weekly paycheck to her.

On or about January 1, 1999, William Jones and Grace Jones set up a joint checking

account at First Federal Credit Union (the "First Federal Joint Account").  From on or about

January 1, 1999 through and including July 14, 2000, a period of 80 weeks, William Jones had

his weekly salary from Murphy & Murphy direct deposited into the Federal Joint Account.

During the period from January 1, 1999 through and including July 14, 2000, William Jones and

Grace Jones had a tacit agreement whereby Grace Jones, promptly upon the crediting of the

direct deposit of the weekly salary, would draw a check on the First Federal Joint Account,

payable to her order, in the full amount of the weekly salary, and deposit said check into the

Grace Jones Checking Account.  The aggregate sum of those paychecks so swept by Grace Jones

is $107,280.00.    Grace Jones never gave any money or property of any kind to William Jones

in exchange for this account sweeping arrangement whereby she received the proceeds of his weekly paycheck.

### 2. Facts bearing on Murren Fraudulent Transfer Counts.

Transfers of money were made by Mr. Murren for real property taxes on the two homes during the four years immediately preceding the commencement of the litigation, and the same were made for the benefit of the Defendant Dorothy Murren, for which taxes Mr. Murren was not obligated and did not receive anything in return.  However, the record does not reveal the quantity of such payments and, therefore, no recovery on account thereof may be had under the fraudulent transfer counts.  As for the many mortgage payments on both homes made by Thomas Murren directly from his bank account, he was obligated on those debts to the respective banks, for which payments he received due credit by means of a reduction of the loan balance by the amount of the installment payment.  Therefore, such payments will fail to qualify as a transfer for less than reasonably equivalent value under the Uniform Fraudulent Transfer Act, nor would the payments themselves constitute payments made with an intent to hinder, delay or defraud creditors.  Thus, there is no recourse for such payments under the Uniform Fraudulent Transfer Act; plaintiff's sole right of recourse therefor being solely an action in equity for the imposition of a constructive trust on the underpinning of the uniquely equitable doctrine of unjust

enrichment.  Hence the first three counts of the plaintiff's claim against Dorothy Murren may be dismissed.  As to Dorothy Murren, Plaintiff will be relying solely on the fourth count.

### B.  Law and Argument.

The first three counts are purely statutory causes of action.  The First Count seeks liability of the Defendant as a transferee of a fraudulent transfer for intentional fraud pursuant to Conn. Gen. Stat. Sec. 52-552e (a)(1).  William Jones' paychecks and, in the case of the "sweeping account" agreement, the proceeds thereof, are "assets" and the tender of his paychecks to the Defendant Grace Jones, as well as the "account sweeping agreement" by which the proceeds of his paychecks are immediately swept by said Defendant, are "transfers", as the terms "assets" and "transfers" are defined under Conn. Gen. Stat. Sec. 52-552b.  The closure of the Joint Bank Account, and hence, the cessation of the regular deposit by William Jones of his weekly paycheck therein, coupled with the creation of the Grace Jones Bank Account and the initiation of a weekly tender by William Jones of his paycheck to Grace Jones, who thereupon deposited the same into the Grace Jones Bank Account, all at a time when William Jones was insolvent and had no assets titled in his name, clearly display the badges of fraud such that a strong inference of an intent to hinder, delay or defraud creditors may be found.  See, Conn. Gen. Stat. Sec. 52-552e (a)(1) and (b).  To the same effect, and intent, is the new joint account coupled with the sweeping agreement with the Defendant.

The Second Count of the Complaint against Grace Jones will not be pursued because it is unnecessary due to the insolvency stipulation that readily applies to the Third Count. The Third Count against Grace Jones seeks recovery for constructive fraud under Section 52-552f, which requires the transfer of an asset without receiving reasonably equivalent value in exchange for the transfer and an insolvent transferor at the time of the transfer. Value is defined by Section 52-552d. "Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied, but value does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person." Id. No such value was given in exchange for those transfers, and the transferor was continuously insolvent at all material times. Hence, the transfers are also constructively fraudulent.

Since the mortgage payments by Thomas Murren constitute transfers by him on account of an antecedent debt owed by him, and value was received by means of due credit for the installment payment, the first three counts of the Murren complaint will not be pressed post-trial.

## V.     Laches Defense to Fourth Count.

### A.  Facts.

The judgment debtors clearly engaged in acts of concealment concerning their actions with respect to the Murphy & Murphy stock and the Van Zant Street property. Indeed, a few

months before filing their bankruptcy petitions in July of 2000, they testified to still being the owners of the stock in Murphy & Murphy, that the Van Zant Street property was lost in foreclosure and that the wife of one of them and the daughter of the other had re-purchased the property from the lender post-foreclosure, which were all false representations. There was absent from their bankruptcy petitions a listing of any interest in the stock. Upon the filing of the bankruptcy petitions, this action was stayed for a number of months. This court can take judicial notice of the abandonment, notice of which is of record in this case.

It was the undersigned's discovery in this case that led to the unearthing of the true nature of the relationship of the debtors to Murphy & Murphy, to the Van Zant Street property and to the residential real properties, as the equitable owners of all of them. Indeed, the Defendants' depositions in 2002 were very enlightening, for it revealed that they knew not what they had with respect to Murphy & Murphy and the Van Zant Street property. Those depositions and subsequent document production revealed the existence and viability of the constructive trust claims relating to those assets. Of course, the judgment debtors' course of conduct with respect to all of those assets was continuous up through the time of the filing of their bankruptcy petitions in July of 2000.

**B.    Law and Argument.**

Statutes of limitation do not apply directly to equitable claims such as the subject cause of action for the imposition of a constructive trust.  They have any application, if any at all, only by analogy, and then only through the doctrine of laches.  Defendants' claims, Mem. Opp. at pp. 4-7 to the contrary are incorrect.   A careful review of <u>Dunham v. Dunham</u>, 204 Conn. 303, 325-27 (1987); <u>Lesser v. Lesser</u>, 134 Conn. 418, 422-24 (1948); <u>Nichols v. Nichols</u>, 79 Conn. 644, 656-58 (1907); and <u>Jeffery v. Fitch</u>, 46 Conn. 601 (1879) bears out the foregoing and the following: when deciding whether the doctrine of laches bars an equitable cause of action, courts of equity may apply a statute of limitation by analogy to bar the equitable action where the plaintiff fully knew of his need to take action to protect his interests upon or shortly after the occurrence of the offensive conduct or transaction, but nonetheless knowingly sat on his legal rights and permitted the statute of limitations for the analogous action at law to lapse (and after said lapse commenced his suit in equity).  But absent any such knowing and prejudicial failure to assert one's rights, the statute of limitations cannot, under the doctrine of laches (or otherwise), bar the equitable case of action (for it is unreasonable and prejudicial delay in bringing suit in equity after plaintiff learns of the offensive conduct that extinguishes an equitable cause of action).  See, e.g., <u>Jeffery v. Fitch</u>, 46 Conn. 601, 604-5 (1879) (Equitable claim to set aside judgment against equitable action plaintiff, of which said plaintiff had no notice, brought

seventeen years after entry of judgment, is not time-barred even though analogous legal claim to set aside such judgment is barred three years after entry of judgment.); <u>Nichols v. Nichols</u>, 79 Conn. 644, 656-57 (1907) (Twenty-six years after offensive conduct and transactions occurred was not too late to challenge them in equity where the plaintiff had no knowledge of the necessity of taking any action to protect his interests, is not chargeable with negligence and third parties have not been prejudiced.)

> The plaintiff is not barred by lapse of time from maintaining this suit.  The relief asked for is equitable, and the effect of the judgment is to require the defendant to account as a trustee *ex maleficio*, or trustee of a constructive trust, for the funds which she may properly be regarded as having received from his interest in the properties in question.  The New York City property having been sold to innocent purchasers, she had the right to pursue the proceeds of the sale without attempting to disturb in any way the deeds to third persons.  While the statutes of limitation referred to do not in terms extend to suits in equity, it is true that equitable remedies must be sought without unreasonable delay, and that in analogy to such statutes courts of equity ordinarily apply rules of limitation which will bar remedies in equity that are barred at law.  But this rule is not applicable when the person seeking such relief has no knowledge of the necessity of taking any action to protect his interests, and is not chargeable with negligence, and the rights of third parties have not been prejudiced by the delay.

<u>Nichols</u>, 79 Conn. at 656-57.

> But what is the limitation of such a petitioner's rights in a court of equity? He is barred of his remedy at law in three years.  When is he barred of his remedy in equity?  Clearly he is bound to seek the aid of a court of equity with no unreasonable delay, and whether he has been negligent in any particular case will depend upon the facts and circumstances of the case.  Courts of equity apply a rule of limitation in analogy to the statute of limitations, and ordinarily the period that would bar a remedy at law will bar a remedy in equity.   Thus, if the

> petitioner in this case had had full knowledge of the existence of the judgment
> from the day it was rendered, we should consider him as barred of all remedy in
> equity when he had by his neglect of his legal rights become barred at law.
> Equity does not encourage parties to procrastinate in such cases. But where a
> party, as here, had no knowledge of any necessity for his moving the matter, his
> neglect to move is not imputable to him as negligence. Here the petitioner had no
> suspicion of the existence of the judgment against him for seventeen years after it
> was rendered, and down to within a few days before the petition was brought;
> while the conduct of the respondent during all that period was such as to prevent
> any such suspicion. The petitioner clearly has been guilty of no such negligence
> as should bar or in any way prejudice his remedy in equity.

Fitch, 46 Conn. at 605; see also, Vissa v. Pagano, 2000 Conn. Super. LEXIS 1102 (2000) (copy

attached) (Unjust enrichment claim is an equitable proceeding for which the court will not apply

the statute of limitations as a bar to the remedy).

Based on the foregoing, and the facts pertaining to the laches defense, Plaintiff has not

been guilty of laches in bringing the fourth count.

WHEREFORE, for the foregoing reasons, judgment should enter in favor of the Plaintiff

and against each of the Defendants, jointly and severally, for the full amount of the outstanding

judgment against the judgment debtors, the sum of $240,179.23 as of February 12, 2004, plus

interest thereon at $30.39 per diem.

**PLAINTIFF, THE CADLE COMPANY**


By:_____

       PAUL N. GILMORE, ESQ.
       Fed. Bar No. ct 03347
       UPDIKE, KELLY & SPELLACY, P.C.
       One State Street
       P.O. Box 231277
       Hartford, CT 06123-1277
       Tel.: (860) 548-2600
       Fax:  (860) 548-2680
       pgilmore@uks.com


## CERTIFICATION OF SERVICE

    This is to certify that on the 13th day of February, 2004, the undersigned did cause to be

sent, via first class U.S. Mail, postage prepaid, a copy of foregoing to:

Paul Sobel, Esq.
Green and Gross, P.C.
1087 Broad Street
Bridgeport, CT 06604-4231


_____
PAUL N. GILMORE, ESQ.
Updike, Kelly & Spellacy, P.C.