for a week exceed the total of 45 times the federal minimum hourly wage.

(4) Under federal law, the amount of wages that may be applied toward a judgment is limited to the lesser of (i) 25% of disposable earnings for a week or (ii) the amount by which disposable earnings for a week exceed 30 times the federal minimum hourly wage.

(5) Pension and retirement benefits and refunds may be claimed as exempt under Illinois law.

The judgment debtor may have other possible exemptions under the law.

THE JUDGMENT DEBTOR HAS THE RIGHT AT THE CITATION HEARING TO DECLARE EXEMPT CERTAIN INCOME OR ASSETS OR BOTH. The judgment debtor also has the right to seek a declaration at an earlier date, by notifying the clerk in writing at (insert address of clerk). When so notified, the Clerk of the Court will obtain a prompt hearing date from the court and will provide the necessary forms that must be prepared by the judgment debtor or the attorney for the judgment debtor and sent to the judgment creditor and the judgment creditor's attorney regarding the time and location of the hearing. This notice may be sent by regular first class mail."

(c) When assets or income of the judgment debtor not exempt from the satisfaction of a judgment, a deduction order or garnishment are discovered, the court may, by appropriate order or judgment:

(1) Compel the judgment debtor to deliver up, to be applied in satisfaction of the judgment, in whole or in part, money, choses in action, property or effects in his or her possession or control, so discovered, capable of delivery and to which his or her title or right of possession is not substantially disputed.

(2) Compel the judgment debtor to pay to the judgment creditor or apply on the judgment, in installments, a portion of his or her income, however or whenever earned or acquired, as the court may deem proper, having due regard for the reasonable requirements of the judgment debtor and his or her family, if dependent upon him or her, as well as any payments required to be made by prior order of court or under wage assignments outstanding; provided that the judgment debtor shall not be compelled to pay income which would be considered exempt as wages under the Wage Deduction Statute. The court may modify an order for installment payments, from time to time, upon application of either party upon notice to the other.

(3) Compel any person cited, other than the judgment debtor, to deliver up any assets so discovered, to be applied in satisfaction of the judgment, in whole or in part, when those assets are held under such circumstances that in an action by the judgment debtor he or she could recover them in specie or obtain a judgment for the proceeds or value thereof as for conversion or embezzlement.

(4) Enter any order upon or judgment against the person cited that could be entered in any garnishment proceeding.

(5) Compel any person cited to execute an assignment of any chose in action or a conveyance of title to real or personal property, in the same manner and to the same extent as a court could do in any proceeding by a judgment creditor to enforce payment of a judgment or in aid of the enforcement of a judgment.

(6) Authorize the judgment creditor to maintain an action against any person or corporation that, it appears upon proof satisfactory to the court, is indebted to the judgment debtor, for the recovery of the debt, forbid the transfer or other disposition of the debt until an action can be commenced and prosecuted to judgment, direct that the papers or proof in the possession or control of the debtor and necessary in the prosecution of the action be delivered to the

creditor or impounded in court, and provide for the disposition of any moneys in excess of the sum required to pay the judgment creditor's judgment and costs allowed by the court.

(d) No order or judgment shall be entered under subsection (c) in favor of the judgment creditor unless there appears of record a certification of mailing showing that a copy of the citation and a copy of the citation notice was mailed to the judgment debtor as required by subsection (b).

(e) All property ordered to be delivered up shall, except as otherwise provided in this section, be delivered to the sheriff to be collected by the sheriff or sold at public sale and the proceeds thereof applied towards the payment of costs and the satisfaction of the judgment.

(f)(1) The citation may prohibit the party to whom it is directed from making or allowing any transfer or other disposition of, or interfering with, any property not exempt from the enforcement of a judgment therefrom, a deduction order or garnishment, belonging to the judgment debtor or to which he or she may be entitled or which may thereafter be acquired by or become due to him or her, and from paying over or otherwise disposing of any moneys not so exempt which are due or to become due to the judgment debtor, until the further order of the court or the termination of the proceeding, whichever occurs first. The third party may not be obliged to withhold the payment of any moneys beyond double the amount of the balance due sought to be enforced by the judgment creditor. The court may punish any party who violates the restraining provision of a citation as and for a contempt, or if the party is a third party may enter judgment against him or her in the amount of the unpaid portion of the judgment and costs allowable under this section, or in the amount of the value of the property transferred, whichever is lesser.

(2) The court may enjoin any person, whether or not a party to the supplementary proceeding, from making or allowing any transfer or other disposition of, or interference with, the property of the judgment debtor not exempt from the enforcement of a judgment, a deduction order or garnishment, or the property or debt not so exempt concerning which any person is required to attend and be examined until further direction in the premises. The injunction order shall remain in effect until vacated by the court or until the proceeding is terminated, whichever first occurs.

(g) If it appears that any property, chose in action, credit or effect discovered, or any interest therein, is claimed by any person, the court shall, as in garnishment proceedings, permit or require the claimant to appear and maintain his or her right. The rights of the person cited and the rights of any adverse claimant shall be asserted and determined pursuant to the law relating to garnishment proceedings.

(h) Costs in proceedings authorized by this Section shall be allowed, assessed and paid in accordance with rules, provided that if the court determines, in its discretion, that costs incurred by the judgment creditor were improperly incurred, those costs shall be paid by the judgment creditor.

(i) This Section is in addition to and does not affect enforcement of judgments or proceedings supplementary thereto, by any other methods now or hereafter provided by law.

(j) This Section does not grant the power to any court to order installment or other payments from, or compel the sale, delivery, surrender, assignment or conveyance of any property exempt by statute from the enforcement of a judgment thereon, a deduction order, garnishment, attachment, sequestration, process or other levy or seizure.

(k) (Blank).

(l) At any citation hearing at which the judgment debtor appears and seeks a declaration that

certain of his or her income or assets are exempt, the court shall proceed to determine whether the property which the judgment debtor declares to be exempt is exempt from judgment. At any time before the return date specified on the citation, the judgment debtor may request, in writing, a hearing to declare exempt certain income and assets by notifying the clerk of the court before that time, using forms as may be provided by the clerk of the court. The clerk of the court will obtain a prompt hearing date from the court and will provide the necessary forms that must be prepared by the judgment debtor or the attorney for the judgment debtor and sent to the judgment creditor, or the judgment creditor's attorney, regarding the time and location of the hearing. This notice may be sent by regular first class mail. At the hearing, the court shall immediately, unless for good cause shown that the hearing is to be continued, shall proceed to determine whether the property which the judgment debtor declares to be exempt is exempt from judgment. The restraining provisions of subsection (f) shall not apply to any property determined by the court to be exempt.

(m) The judgment or balance due on the judgment becomes a lien when a citation is served in accordance with subsection (a) of this Section. The lien binds nonexempt personal property, including money, choses in action, and effects of the judgment debtor as follows:

(1) When the citation is directed against the judgment debtor, upon all personal property belonging to the judgment debtor in the possession or control of the judgment debtor or which may thereafter be acquired or come due to the judgment debtor to the time of the disposition of the citation.

(2) When the citation is directed against a third party, upon all personal property belonging to the judgment debtor in the possession or control of the third party or which thereafter may be acquired or come due the judgment debtor and comes into the possession or control of the third party to the time of the disposition of the citation.

The lien established under this Section does not affect the rights of citation respondents in property prior to the service of the citation upon them and does not affect the rights of bona fide purchasers or lenders without notice of the citation. The lien is effective for the period specified by Supreme Court Rule.

This subsection (m), as added by Public Act 88-48, is a declaration of existing law.

(n) If any provision of this Act or its application to any person or circumstance is held invalid, the invalidity of that provision or application does not affect the provisions or applications of the Act that can be given effect without the invalid provision or application.

**HISTORY:**
Source: P.A. 84-1043; 88-48, § 5; 88-299, § 5; 88-667, § 20; 88-670, § 2-67; 89-364, § 45.

**NOTES:**
NOTE.
    This section was Ill.Rev.Stat., Ch. 110, para. 2-1402.

UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT

---

| | | |
|---|---|---|
| In re: | ) | |
| | ) | CHAPTER 7 |
| FRANK F. OGALIN, | ) | |
| | ) | |
| Debtor. | ) | CASE NO. 00-32944(ASD) |
| THE CADLE COMPANY, | ) | |
| | ) | |
| Plaintiff | ) | |
| v. | ) | ADV. PRO. NO. 00-3188 |
| | ) | |
| FRANK F. OGALIN, | ) | |
| | ) | |
| Defendant. | ) | JAN 2 3 2004 |

---

APPEARANCES:

Paul N. Gilmore, Esq.                   Attorney for Plaintiff
Updike, Kelly & Spellacy, P.C.
One State Street
P.O. Box 231277
Hartford, Connecticut 06123-1277

Roy W. Moss, Esq.                       Attorney for Debtor-Defendant
102 Highland Avenue
Rowayton, Connecticut 06853

---

## MEMORANDUM OF DECISION ON OBJECTION TO DISCHARGE

DABROWSKI, ALBERT S., Chief United States Bankruptcy Judge

### I. INTRODUCTION

In this adversary proceeding one of the Debtor's creditors challenges his entitlement

to a discharge of debts under Chapter 7 of the Bankruptcy Code. For the reasons stated

herein, the Court will sustain the Plaintiff's claim and deny the Debtor's discharge.

## II. JURISDICTION

The United States District Court for the District of Connecticut has subject matter jurisdiction over the instant adversary proceeding by virtue of 28 U.S.C. § 1334(b); and this Court derives its authority to hear and determine this matter on reference from the District Court pursuant to 28 U.S.C. §§ 157(a), (b)(1).  This is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2)(J).

## III. GENERAL FACTUAL BACKGROUND

This factual background is derived from the testimonial and documentary evidence received at trial, as well as the Court's own noticing of the official files and records of this case and adversary proceeding.

In or about June 1989, the Debtor, Frank Ogalin (hereafter occasionally referred to as "Frank"), and his brother, Jeffrey Ogalin (hereafter, "Jeffrey"), incorporated a drywall construction business known as Walls & Ceilings, Inc. (hereafter, "W&C").  In connection with the operation of W&C, Frank and Jeffrey incurred significant unpaid debts, including "responsible person" tax liability exceeding the sum of $100,000.00, for failure to remit federal withholding taxes on employee wages.  Not later than February 1991, certain of Frank's tax obligations had ripened into federal tax liens encumbering his property.[1]

In May, 1991, Frank and Jeffrey ceased operating W&C, and were involved in the formation and operation of another family-owned drywall construction firm - Drywall

---

[1] The record reveals that Internal Revenue Service (hereafter, "IRS") liens also encumbered the property of Verna Ogalin, Frank's wife.  Exhibit J evidences a lien for "1040" income tax against Frank *and* Verna for Tax Years 1988 and 1989.  Exhibits K and L evidence a lien against Frank *and* Verna for "6672" taxes for the period ending September 30, 1990.

Construction Corp. (hereafter, the "Corporation"). Frank's and Jeffrey's mother, Margaret Ogalin (hereafter, "Margaret"), was the incorporator of the Corporation, and their respective wives - Verna Ogalin (hereafter, "Verna") and Marie Ogalin (hereafter, "Marie") were the original shareholders. The initial directors of the Corporation were Frank and Jeffrey. In addition, Jeffrey was named as its President and Treasurer, and Frank its Vice President and Secretary.

Verna contributed approximately $2000.00 to the Corporation in consideration for her 50% equity interest therein. At its inception the Corporation had business equipment with a value of approximately $5000.00, although the identity of the contributor of those assets was not disclosed on the record.

In the year 1994, Jeffrey ceased his involvement with the Corporation, and began a business of his own. According to Frank and Jeffrey, the Corporation did not have enough business at that time to support two families, so Jeffrey moved on to an independent venture. Upon Jeffrey's departure from the Corporation, Verna became its President. Also in connection with Jeffrey's departure, Marie transferred her portion of the stock of the Corporation to Verna for no monetary consideration. According to Frank, this transfer occurred at the behest of Verna.

On the same day that she received Marie's shares, Verna transferred her resulting 100% equity interest in the Corporation (hereafter, the "Stock") to Christina Ogalin (hereafter, "Christina") - her and Frank's eldest daughter - in the following fashion: 25% directly to Christina, and 75% to Christina as trustee for her three younger siblings. Christina was 15 years of age at that time.

Christina also worked for the Corporation, having begun such employment in 1995 at the age of 16. Her part-time duties were largely limited to working with payroll and subcontractor records. After graduation from high school in 1996, Christina became a full-time employee of the Corporation. At all times relevant to this proceeding Christina lived with her parents and younger siblings.

In 1997, at the urging of Verna, Frank resigned as an officer of the Corporation. At that time Christina took over as Vice-President and Secretary. Verna remained as President. In January 1999, at the age of 20, Christina was promoted to President of the Corporation. Verna then became its Vice-President. In the five-year period, 1996 through 2000, the Corporation paid a total of $664,577.12 in wages (salary and bonuses) to Ogalin family members. Of that total, Christina received 65%; Verna received 26% and Frank received 9%.[2]

Within the time-frame relevant to this adversary proceeding, one or more members of the Ogalin family have held an interest in the following real estate: (i) 3425 Huntington Road, Stratford, Connecticut (hereafter, the "Huntington Road Property"); (ii) 1451 North Peters Lane, Stratford, Connecticut (hereafter, the "Peters Lane Property"); (iii) 283 High

---

[2] The reported (W-2) wage income of Frank, Verna and Christina, and percentage of the total, in the subject time-frame is as follows:

|  | Frank | Verna | Christina | Total |
|---|---|---|---|---|
| 1996 | -0- | $45,100.00 | $13,651.00 | $58,751.00 |
| 1997 | -0- | $26,497.77 | $60,000.00 | $86,497.77 |
| 1998 | $34,500.00 | $26,000.00 | $149,770.00 | $210,270.00 |
| 1999 | $10,000.00 | $34,208.35 | $140,450.00 | $184,658.35 |
| 2000 | $15,000.00 | $41,200.00 | $68,200.00 | $124,400.00 |
|  | $59,500.00 (9%) | $173,006.12 (26%) | $432,071.00 (65%) | $664,577.12 |

Ridge Road, Fairfield, Connecticut (hereafter, the "Fairfield Property"); and (iv) 38 Second Avenue, Seymour, Connecticut (hereafter, the "Seymour Property"). At all relevant times the Huntington Road Property was owned jointly by Frank and Jeffrey. This property had been their childhood residence, and was used by them thereafter as, *inter alia*, an office for W&C and the Corporation.[3] The Peters Lane Property appears to have been owned by Frank and Verna jointly.[4] It was the principal residence for them and their children until early 1999, at which time their interest was foreclosed by the holder of a mortgage thereon. At all relevant times, the Fairfield Property was solely owned by Christina. It was purchased by her in March, 1999, and became the principal residence of the Ogalin family following the foreclosure of the Peters Lane Property. The Seymour Property is a four-family residence which, at all relevant times, was wholly owned by Christina. As of the trial of this proceeding, she occupied one of the units there as her principal residence, having left the Fairfield Property in or about the Summer of 2001.

On June 30, 2000 (hereafter, the "Petition Date"), Frank commenced the instant bankruptcy case through the filing of a voluntary petition for relief under Chapter 7 of the United States Bankruptcy Code. Thereupon Barbara Hankin (hereafter, the "Trustee") was appointed trustee of the resulting bankruptcy estate.

The Plaintiff, The Cadle Company (hereafter occasionally, "Cadle") is a creditor of Frank. On December 13, 2000, Cadle commenced the instant adversary proceeding, seeking to have Frank's expected discharge denied under the authority of Bankruptcy

---

[3] This property also served as a residence for Margaret until her passing.

[4] There was evidence in the record that both Frank and Verna were obligated on a mortgage encumbering the Peters Lane Property.

Code Sections 727(a)(2)(A) and 727(a)(4)(A).

On June 28, 2002, on the basis of many of the same operative facts as are involved in this proceeding, the Trustee initiated an adversary proceeding (Adv. Pro. No. 02-3077(ASD)) against Verna, the four Ogalin children, and the Corporation, seeking to avoid certain "transfers" of property pursuant to, *inter alia*, Bankruptcy Code Sections 544 and 548 (hereafter, the "Avoidance Action").  On or about May 14, 2003, and pursuant to a public auction presided over by this Court, Cadle purchased the Trustee's interest in the Avoidance Action, which has not yet been tried, or consolidated with this proceeding.

## IV.  DISCUSSION

### A.  Legal Standards.

The granting or denial of a discharge in a Chapter 7 bankruptcy case is governed by Bankruptcy Code Section 727.  The provisions of Code Section 727 implicated in the instant proceeding provide in pertinent part as follows:

(a) The court shall grant the debtor a discharge, unless—

* * * *

(2) the debtor, with intent to hinder, delay, or defraud a creditor . . . has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed --

(A) property of the debtor, within one year before the date of the filing of the petition; [or]

* * * *

(4)  the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account;

* * * *

11 U.S.C. § 727 (2000).

The party objecting to the granting of a discharge bears the ultimate burden of persuasion by a preponderance of the evidence. Fed. R. Bankr. P. 4005; cf. Grogan v. Garner, 498 U.S. 279 (1991). Further, given that the denial of a debtor's discharge "imposes an extreme penalty for wrongdoing", Section 727 "must be construed strictly against those who object to a debtor's discharge and 'liberally in favor of the bankrupt'". In re Chalasani, 92 F.3d 1300, 1310 (2d Cir. 1996). Nevertheless, the relief of a bankruptcy discharge is not an absolute right, but rather, a privilege accorded to honest debtors who conduct their financial affairs with honesty and openness, and otherwise satisfy the Bankruptcy Code's statutory obligations.

## B. Section 727(a)(2).

### 1. The Plaintiff's Theory - Asset Diversion.

The thrust of Cadle's claim is that since the demise of W&C, Frank has engaged in an effort to structure his personal and business financial affairs so as to hinder his creditors' attempts to collect the debts due from him. Specifically, Cadle believes that the Corporation derived its value largely through the effort and industry of Frank, and was, at all relevant times, fully within his control. Cadle claims that despite that economic reality, Frank (i) directed the placement of title to the Stock in his wife's, and later his children's, names; and (ii) avoided the receipt of substantial personal service income by placing Verna and Christina in figure-head positions, and channeling the vast majority of the Corporation's net income to them, permitting them to acquire property which he enjoyed essentially as his own through possession and use. Further, the fact that much of the relevant conduct may have occurred outside the one-year reach-back period of Section 727(a)(2)(A) does not deter Cadle since it alleges that those actions constitute

*concealments* of property which, although initiated over one year before the Petition Date, *continue as such* to the present day.

      a.  *Continuing concealment.*

A "continuing concealment" doctrine is well-settled in sister Circuits.  Under the classic formulation of that doctrine, a debtor's transfer of legal title to property prior to one year before the bankruptcy petition date, coupled with a retention of certain attributes of beneficial ownership into the one-year reach-back period of Section 727(a)(2)(A), can constitute a "concealment" within the meaning of that Section.  E.g., Rosen v. Bezner (In re Rosen), 996 F.2d 1526, 1532 (3d Cir. 1993); In re Olivier, 819 F.2d 550, 553 (5th Cir. 1987); In re Kaufman, 675 F.2d 127, 128 (7th Cir. 1981).

The contours of the factual scenario in the present proceeding, however, do not fit this template precisely.  Technically, Frank made no "transfers" of legal title.  He never had a legal interest in the Stock to transfer to Verna.  Instead, Verna received her legal interest in the Stock at the initial formation of the Corporation.  Likewise, Frank never held legal title to the Fairfield Property.  Instead, Christina acquired that real estate from an unrelated third party with funds she "earned" working for the Corporation.  Nonetheless, the atypical structure of the concealment alleged here is not reason alone to absolve the Debtor of concealment in the one-year pre-petition period.  As the Second Circuit Court of Appeals has counseled in the discharge context, disqualifying acts can be "as varied as the fish in the sea."  Salomon v. Kaiser (In re Kaiser), 722 F.2d 1574, 1583 (2d Cir. 1983).

The variety of misconduct which Cadle claims to exist in this case is concealment of *equitable* property interests retained not following transfer, but incident to *diversions* orchestrated by Frank.  In a nutshell, the claim here is that there was an attempt to

frustrate Frank's creditors by diverting the fruits of his industry to other Ogalin family members, who then provided him with use and enjoyment of material comforts purchased with those fruits.

Although the evidence of the flow of funds and other assets away from Frank strongly suggests that such movements were orchestrated to hinder the efforts of creditors to collect on their claims, there was no *direct* evidence that Frank himself was the "conductor", or that he acted with the illicit *mens rea* required under Section 727(a)(2). Rather, the direct evidence portrayed Frank as depressed and unengaged, and while generally aware of his creditors' claims and the actions of the Corporation and his family members, content simply to permit, and acquiesce in, the decisions made by Verna and Christina.    Nonetheless, the record of this proceeding, and reasonable inferences therefrom, provide ample evidence of purposeful conduct by Frank intended to "hinder, delay or defraud" creditors within the meaning of Section 727(a)(2).

    b. *Badges of fraud.*

Rarely, if ever, does a debtor admit to intentionally hindering, delaying or defrauding his creditors.  Consequently, courts must often look to various "badges of fraud" to infer an illicit intention.  "Badges" which are strong indicators of a debtor's illicit intent in a diversion/concealment scenario include the following:

    (1)    family or close relationship between the participants;

    (2)    lack of consideration for the property diverted;

    (3)    enjoyment of possession for use and benefit;

    (4)    financial condition of the debtor before and after the diversion;

    (5)    cumulative effect of transactions and course of conduct after financial

difficulties arise; and

(6)    general chronology and timing of events.

(hereafter, the "Badges"). Cf. Kaiser, 722 F.2d at 1582-83.

In the present case, the Badges weigh heavily against the Debtor-Defendant. First, the evidence reveals that there is a close family relationship between Frank, Verna and Christina - the primary participants in the relevant course of conduct. Second, Frank plainly enjoys possession, for his use and benefit, of significant items of property acquired and provided by Verna and/or Christina. Finally, while one might conclude from the evidence that Frank received some value - the use and enjoyment of property - in consideration for his diversion of the fruits of his industry to his family members, the more fundamental and relevant question is the extent to which, *vis-a-vis his creditors*, Frank received *effective* consideration. In other words, the relevant inquiry is not simply whether Frank received consideration, but whether that consideration was in a form available for execution by creditors, *i.e.* an assessment of the extent to which such creditors were deprived of the value of the diverted property. In the language of the remaining Badges, this Court concludes, from the evidence as a whole, including the "general chronology of events", that the "cumulative effect of transactions and course of conduct" after Frank's financial difficulties arose was to hinder and delay his creditors.

Notwithstanding the weight of the Badges, and other evidence strongly suggestive of illicit purpose and conduct vis-a-vis creditors, the Ogalins would have this Court believe that the placement of ownership of the Corporation, and the direction of the vast majority of its earnings, into the hands of Frank's family members had nothing to do with the claims of his creditors. Verna and Christina testified at length as to the *bona fides* of their

- 10 -

positions within the Corporation and the extent of their compensation therefrom. A recurring theme in their testimony was a general minimization of the role of Frank in the success of the enterprise. He was characterized as a depressed, part-time estimator whose poor management skills were a liability to the Corporation. By contrast, Christina, and to a lesser extent, Verna, were portrayed as energetic, competent, and hard-working employees executing the vast majority of the Corporation's business functions, and therefore largely responsible for its success. In general, the Ogalins' testimony, while credibly supportive of the competence and legitimacy of Verna and Christina's corporate stewardship, was not credible as to the degree of Frank's contribution to the business enterprise of the Corporation.[5] More fundamentally, however, nothing in the testimony of the Ogalins credibly supports their claim that the allocation of corporate resources away from Frank was done without reference to the hindering effect that such allocation would have upon the collection efforts of his creditors. This latter conclusion is illustrated by the Court's chronological summary, which follows.

c. *Chronology*.

In 1991, at the time the Corporation was created, Frank and Verna were well aware of Frank's personal obligation to the IRS, which they believed might threaten any non-exempt property interest in Frank's name. Thus, on the advice of counsel,[6] the Stock was

---

[5] The Court in fact finds that Frank was an indispensable element of the Corporation's success, and that he contributed at least as much value to the enterprise as did Verna and Christina.

[6] There was inconsistent testimony on the question of *why* Verna and Marie were chosen as the original shareholders. Frank testified that he and Jeffrey did not decide to put the Stock in their wives' names. Instead, he claimed that Margaret (the incorporator), Verna and Marie decided to do it that way; and they simply did not "offer" him an equity interest. Marie, however, testified that the women did not decide the matter. Rather, she stated that the Corporation was wholly formed and run by Jeffrey and Frank. Jeffrey, interestingly, offered a third, and more plausible, view - that the Stock was placed in the names of Marie and Verna on the advice of counsel.

placed in the names of Verna and Marie, for monetary consideration approximating the value of the physical assets to be possessed by the Corporation. By the time in 1994 when Frank concluded that he and Jeffrey would have to pursue independent business paths, Verna had concluded that Frank was a poor business manager, and resolved to take over the fiscal reigns of the Corporation, and leave Frank with control only over the operations (*e.g.*, job estimations, contract fulfillment, business production, etc.). Frank permitted this change, and Verna's assumption of Jeffrey's former office of company President, in part to appease her, in part because he agreed with her assessment of his strengths and weaknesses, and in part because it provided a vehicle for the Corporation to "legitimately" direct more of its income away from him, and thereby his creditors.

Simultaneous with Jeffrey's departure, his family's portion of the Stock was transferred from Marie to Verna. Verna's immediate reconveyance of the Stock to Christina - in her individual and fiduciary capacities - is corroborative of documentary evidence in the record[7] suggesting that at least by this time Verna had become concerned that her assets, too, were vulnerable to IRS tax liens, and perhaps the claims of other creditors.

Frank received no income from the Corporation in Tax Years 1995, 1996 and 1997,[8] even though he was working on the Corporation's business throughout that period, and remained its Vice President for most of that time. On March 1, 1997, the Corporation executed a series of changes orchestrated by Verna. At a special meeting of the

---

[7] *See* fn. 1.

[8] This string of uncompensated years may have begun prior to 1995. However, the record appears to contain no evidence as to Tax Years 1994 and earlier.

Corporation's shareholders (Christina) and directors (Verna and Frank), Frank resigned as a Director and Vice President. Those positions were then assumed by his teenage daughter, Christina, who had worked full-time for the Corporation only since 1996. The Corporation also reallocated its payroll as part of these changes. In 1997, the wage income of the Ogalin family from the Corporation was distributed as follows: Christina (Vice President) - $60,000.00; Verna (President) - $26,497.77; Frank - $0.

In 1998, the Corporation apparently thrived. In that year, the wage income of the Ogalin family from the Corporation was distributed as follows: Christina (Vice President) - $149,770.00; Verna (President) - $26,000.00; Frank - $34,500.00. 1999 would also prove to be a good year for business. Yet, in the early days of 1999, the Ogalins faced a significant family crisis - the foreclosure of their principal residence, the Peters Road Property. In light of that crisis, on or about January 10, 1999, at a special meeting of the Corporation's shareholders (Christina) and directors (Verna and Christina), Christina replaced Verna as President. Just days thereafter, Christina entered into a contract for the purchase of the Fairfield Property and, presumably, applied for the mortgage used to finance 90% of that purchase. It is clear to the Court that Christina's elevation within the Corporation was intended to facilitate her purchase of the Fairfield Property by, *inter alia*, bolstering and legitimizing her mortgage application.

One cannot read the foregoing account without being struck by the predominant role played by Verna in the events of relevance to this proceeding. Indeed, an understanding of Verna's competence, intentions and actions is the key to a resolution of this adversary proceeding.

After the demise of W&C, and the foundering of the Corporation in the early 1990's, it became clear to Verna that for all his technical expertise, Frank was not a sufficiently competent business person to run the Corporation in a profitable manner. To her credit, she acted decisively and competently in seizing control of the management of the business aspects of the Corporation, relegating her husband to estimating and the other technical aspects of the Corporation's enterprise (hereafter, the "Management Coup"). With this the Court can certainly find no moral fault; Verna acted legitimately to salvage the family's business for the preservation of their lifestyle.

However, Verna was not only focused upon the Corporation's ability to produce income going forward. She was also keenly aware of the fact that the business' past performance had left Frank's assets (and her own) vulnerable to the claims of creditors. She acted decisively to address this concern as well; first in the ownership of the Stock; later, in the payment of wages; and finally, in the ownership of real estate. In each of these areas, the record reveals a striking pattern of asset direction and allocation away from Frank, and to a somewhat lesser degree, away from Verna, and toward their eldest child, Christina. Christina's own testimony revealed a poised and competent young person. Yet to accept that Christina - a 20-year-old, still living at home - could become (i) the recipient of the Stock and the lion's share of the Corporation's income, and (ii) the owner of the family's principal residence and investment property, for any reason other than her parents' design in avoiding creditor executions, strains the credulity of this Court to the breaking point.

The asset direction and allocation orchestrated by Verna, like her Management Coup, was understandable under the circumstances. Nonetheless, unlike the Management Coup, the asset allocation strategy was illicit vis-a-vis creditors.

Plainly, Verna's intentions and conduct in orchestrating a strategy to hinder and delay the family's creditors, *standing alone*, do not bear on Frank's entitlement to a bankruptcy discharge. Nonetheless, when coupled with Frank's knowledge and acquiescence, Verna's conduct forms the basis for discharge disqualification under Section 727(a)(2)(A). The statute not only disqualifies a debtor for his own direct concealment, but also concealment which he "permitted". Here, Frank had intimate knowledge of Verna's strategy and permitted it, with a "wink and a nod", through his inaction.

In sum, the asset diversion conduct established on the record of this adversary proceeding is sufficient to disqualify the Debtor from discharge under the terms of Bankruptcy Code Section 727(a)(2)(A).

## 2. *Payments in Lieu of Wages.*

The asset diversion conduct discussed in the preceding section of this Memorandum of Decision is sufficient, standing alone, to disqualify the Debtor from the benefit of a bankruptcy discharge. Nonetheless, the record at trial also revealed a different, independently-disqualifying, pattern of misconduct vis-a-vis creditors - an effort by Frank to hide his actual wage income from taxing authorities, and other creditors, by having a large portion of the value of such wages transferred to his benefit through the

Corporation's unreported direct payment and/or reimbursement of his personal expenses.[9] Specifically, after being paid a salary of $34,500.00 in 1998, Frank "negotiated" with Christina for a decrease in that salary - to $10,000 in 1999, and $15,000 in 2000 - so long as the Corporation paid and/or reimbursed certain of his personal expenses, including transportation, clothing, legal fees, etc. (hereafter, the "Payment-in-lieu Conduct").[10]

The "concealment" revealed by the Payment-in-lieu Conduct is more classically postured than the asset diversion conduct described in the preceding section of this Memorandum of Decision.  For instance, the concealment of Year 2000 income first occurred within one year prior to the Petition Date, so that a claim respecting that conduct does not depend on a theory of *continuing* concealment for its viability.  Also, most, if not all, of the assets concealed by the Payment-in-lieu Conduct - *i.e.* income in kind - were actually received and legally owned and retained by Frank, not diverted to others for title retention.  Finally, whereas Frank's conduct with respect to the asset diversions might be fairly characterized as *passive*, in the course of the Payment-in-lieu Conduct he was shown to be *actively* engaged in an effort to keep the fruits of his industry shrouded, by initiating and negotiating a changed compensation scheme with Christina.  In the parlance of Section 727(a)(2), he "concealed", not merely "permitted to be . . . concealed".

In sum, the record makes plain that Frank intentionally secreted a significant portion of his personal service income in 1999 and 2000, by arranging to draw a relatively small

---

[9] This conduct was not alleged in the Complaint.  It was elicited through testimony without objection.  Thus the Complaint is deemed amended to conform to such evidence as provided by Bankruptcy Rule 7015 (making Fed. R. Civ. P. 15(b) applicable to bankruptcy adversary proceedings).

[10] Frank's receipt of assets in lieu of wages was not reported to the IRS by the Corporation in its W-2 statements, in apparent violation of federal law.

- 16 -

salary, with the balance of his income received in the form of corporate direct payment and reimbursement of many of his personal expenses. By such efforts Frank intended to receive property "under the radar screen" of his creditors; and thus, such conduct is disqualifying of the right to a bankruptcy discharge under the authority of Section 727(a)(2)(A).

## C. Section 727(a)(4).

Given the Court's determination that the Debtor's discharge should be denied under the authority and standards of Bankruptcy Code Section 727(a)(2)(A), it is not necessary for the Court to consider the Plaintiff's claims under Section 727(a)(4).


## V. CONCLUSION

For the foregoing reasons, judgment shall enter in favor of the Plaintiff in this adversary proceeding. A judgment denying the Debtor's discharge shall enter simultaneously herewith.


BY THE COURT

DATED: _January 23, 2004_

Albert S. Dabrowski    1/23/04
Chief United States Bankruptcy Judge


- 17 -

UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT

```
-------------------------------------------------
In re:                              )
                                    )      CHAPTER  7
FRANK F. OGALIN,                    )
                                    )
          Debtor.                   )      CASE NO.  00-32944(ASD)
-------------------------------------------------
THE CADLE COMPANY,                  )
                                    )
          Plaintiff                 )
v.                                  )
                                    )      ADV. PRO. NO.  00-3188
FRANK F. OGALIN,                    )
                                    )
          Defendant.                )
-------------------------------------------------          JAN 2 3 2004
```

## JUDGMENT

This adversary proceeding having come on for trial, and the Court having received and reviewed the evidence, and considered the arguments of the parties thereon; and having this day entered its <u>Memorandum of Decision on Objection to Discharge</u>, in accordance with which it is hereby

**ORDERED** that judgment shall enter in favor of the Plaintiff.  The discharge of the Debtor-Defendant is **DENIED** under the authority of 11 U.S.C. § 727(a)(2)(A).

BY THE COURT

DATED:   January 23, 2004

Albert S. Dabrowski    1/23/04
Chief United States Bankruptcy Judge

Source: Legal > States Legal - U.S. > Connecticut > Cases > CT Cases, Administrative Decisions & Attorney General
Opinions, Combined 🔲
Terms: burden /s proof /s unjust /s enrichment /p preponder!  (Edit Search)

�díSelect for FOCUS™ or Delivery

☐

*1990 Conn. Super. LEXIS 153, **

DICESARE-BENTLEY ENGINEERS, INC. v. LEGNOS BOAT INDUSTRIES, INC.

No. CV-88-0508434-S

Superior Court of Connecticut, Judicial District of New London, at New London

1990 Conn. Super. LEXIS 153

July 23, 1990, Decided
July 26, 1990, Filed

**NOTICE: [*1]**

THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW.
COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF
THIS CASE.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff engineer filed an action against defendant landowner
for services rendered by the engineer at the request of the landowner, with a second
count alleging unjust enrichment.

**OVERVIEW:** The landowner contacted the engineer asking for a quote for the engineer
to perform surveying services on the landowner's property. The engineer did not respond
to the landowner's inquiry and approximately 15 months later the engineer commenced
work for the landowner. The engineer sent the landowner a bill, which the landowner
claimed was the first knowledge he had of the engineer's commencement of the work.
The engineer filed suit and testified that while he could not remember the specific
circumstances under which he was actually engaged to work for the landowner, he
claimed that he did not dream up the job. The trial referee found that the existence of a
contract was a question of fact to be determined from all the evidence and that the
engineer had failed to prove the existence of a contract. The court in its memorandum of
decision held that the engineer could not recover under **unjust enrichment** because no
benefit had been conferred upon the landowner, the landowner did not know that the
engineer was performing the work, and the landowner had not retained any benefit from
the engineer's work.

**OUTCOME:** The court entered judgment in favor of the landowner against the engineer
on both counts of the engineer's complaint.

**CORE TERMS:** unjust enrichment, conversation, aerial, reasonable belief, conferred, probable,
photographs, performing, abutting, contour, dream

### LexisNexis (TM) HEADNOTES - Core Concepts - ♦ Hide Concepts

Civil Procedure > Trials

*HN1* The **burden of proof** is on the plaintiff. The plaintiff must prove his allegations by a **preponderance** of the evidence. In a civil case, a party would satisfy this burden if the evidence he presented, considered fairly and impartially, would induce in the mind of a court a reasonable belief that it is more probable than otherwise that a fact is true.  More Like This Headnote

Contracts Law > Formation > Formation Generally
*HN2* Whether a contract exists is a question of fact for the court to determine from all of the evidence before it.  More Like This Headnote

Contracts Law > Types of Contracts > Implied-in-Law Contracts
*HN3* There are three essential elements that must be established in order for the plaintiff to claim unjust enrichment. These elements are: (1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; (3) the acceptance or retention, by the defendant, of the benefit under circumstances as to make it inequitable for the defendant to retain the benefit without paying its value.  More Like This Headnote

## OPINION: MEMORANDUM OF DECISION

The plaintiff commenced this lawsuit against the defendant corporation alleging an oral contract for work performed by the plaintiff at the request of the defendant. A second count alleges unjust enrichment.

The first count involves the fundamental question whether or not the parties ever made an agreement for the plaintiff to perform work for the defendant.

The following facts are found by the trial referee:

The plaintiff is engaged in the business of providing engineering and surveying services. The plaintiff came in contact with the defendant when the plaintiff was performing work on abutting known as Business Industrial Park, Route 117, Groton, Connecticut.

On or about November 27, 1985, the defendant wrote a letter to the plaintiff asking for a quote from the plaintiff to perform certain work on the defendant's property. Specifically, the defendant requested ". . . please let me know the cost of including aerial contour surveys of our land located at 952 North **[*2]** Road and 973 North Road . . ." The plaintiff did not respond to said letter and did not give a quote orally or in writing to the defendant. Approximately fifteen months later in February of 1987, the plaintiff commenced work on the defendant's property for the purpose of taking aerial photographs to prepare contour lines of the defendant's property. The plaintiff arranged to have aerial photographs taken of the defendant's property along with seventeen other properties. The plaintiff claims that in late winter of 1987, the defendant authorized him to proceed with the work. The plaintiff did not, at this time, give any quote to the defendant. The plaintiff testified "I know I didn't dream this job up." However, he cannot recall the circumstances or specifics of this conversation with the defendant as to the date, time, place and who was present. The defendant denies every having such a conversation or ever authorizing the work. The defendant testified that he did not discuss the job with the plaintiff and first learned that the plaintiff did the work when he received a bill from the plaintiff, some fifteen (15) months after he requested a quote for the work.

*HN1* The burden of **[*3]** proof is on the plaintiff. The plaintiff must prove his allegations by a preponderance of the evidence. Vigorito v. Allard, 143 Conn. 70, 71 (1955). In a civil case, a party would satisfy this burden if the evidence he presented, considered fairly and impartially,

would induce in the mind of the Court a reasonable belief that it is more probable than otherwise that a fact is true. <u>Busher v. United Illuminating Co., 156 Conn. 456, 458 (1968).</u> In this case, the plaintiff had to show a reasonable belief that it was more probable than not that a contract existed between the parties. The plaintiff has not done so. The plaintiff testified that he would not have done the work unless authorized to do it and didn't just "dream it up" but he cannot remember any specifics of the conversation with the defendant. Given the length of time between the initial request for a quote by the defendant (November of 1985) and when the work was performed (February of 1987) and the lack of any quote by the plaintiff to the defendant after the defendant specifically requested one, it is not reasonable to conclude that the defendant authorized the plaintiff to do the work and, thus, made a contract **[*4]** with the plaintiff. Neither is it reasonable to conclude that the defendant consented to the plaintiff's work because the plaintiff's employees parked on the defendant's property. There was testimony that the plaintiff was performing other work in the area on abutting lands and had asked the defendant's permission to park on the defendant's land.

*HN2*Whether a contract exists is a question of fact for the court to determine from all of the evidence before it. <u>Randolph Construction v. Kings East Corporation, 165 Conn. 269, 277 (1973).</u>

Based on the above-stated facts, this court should not conclude that a contract, in fact, existed between the plaintiff and the defendant.

The second count of the complaint alleges the theory of unjust enrichment. The plaintiff correctly points out, in his brief on page 6, that it cannot recover under the theory of unjust enrichment. *HN3*There are three essential elements that must be established in order for the plaintiff to claim unjust enrichment. These elements are: (1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; (3) the acceptance or retention, by the defendant, **[*5]** of the benefit under circumstances as to make it inequitable for the defendant to retain the benefit without paying its value. See <u>CBS Surgical Group, Inc. v. Holt, 37 Conn. Sup. 555, 557 (1981).</u> This court should find that none of these elements are present in this case. No benefit has been conferred upon the defendant by the plaintiff; the plaintiff did not know that the defendant was performing the benefit and the defendant has not retained any benefit that the plaintiff performed.

WHEREFORE, this court should enter judgment in favor of the defendant on both counts.

---

Source: <u>Legal</u> > <u>States Legal - U.S.</u> > <u>Connecticut</u> > <u>Cases</u> > **CT Cases, Administrative Decisions & Attorney General Opinions, Combined** 🔲
Terms: **burden /s proof /s unjust /s enrichment /p preponder!** (<u>Edit Search</u>)
View: Full
Date/Time: Sunday, March 21, 2004 - 7:38 PM EST

* Signal Legend:
● - Warning: Negative treatment is indicated
⚠ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
Ⓐ - Citing Refs. With Analysis Available
❶ - Citation information available
* Click on any *Shepard's* signal to *Shepardize*® that case.