UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
(Bridgeport)

| | | |
|---|---|---|
| THE CADLE COMPANY<br>    Plaintiff, | ) <br> ) <br> ) | CIVIL ACTION |
| vs. | ) <br> ) | MASTER DOCKET NO. <br> 3:00 CV-00316 (WWE) |
| GRACE JONES | ) <br> ) <br> ) | PLEADING APPLICABLE TO: <br> 3:00 CV-00316 (WWE) |
| Defendant. | ) <br> ) | 3:00 CV-00317 (WWE) |
| | ) <br> ) | |
| THE CADLE COMPANY<br>    Plaintiff, | ) <br> ) <br> ) | |
| vs. | ) <br> ) <br> ) | |
| DOROTHY MURREN, | ) <br> ) <br> ) | |
| Defendant | ) <br> ) | |
| | ) | JUNE 14, 2004 |

**PLAINTIFF'S SUPPLEMENTAL POST-TRIAL MEMORANDUM**

I.    **Introduction.**

The Plaintiff, The Cadle Company ("Cadle" or "Plaintiff"), hereby submits its

Supplemental Post-Trial Memorandum in response to the Court's request that Plaintiff "elaborate

upon its statement at page 8 of its Reply Brief that the facts giving rise to the claims for the

353455

imposition of constructive trusts 'do not satisfy the essential elements for claims under the Act.'
Plaintiff should apply its analysis to each property upon which it seeks to impose a constructive
trust."

Preliminarily, it bears emphasis that the Fourth Count is exclusively equitable and is not
exercised in aid or support of a legal right. It is not predicated upon any legal cause of action
and is instead exclusively of equitable cognizance. This is made evident by the nature of the
constructive trust claim and its underpinnings being firmly planted in the uniquely equitable
doctrine of unjust enrichment. See, Wendell Corp. Trustee v. Thurston, 239 Conn. 109, 113-14,
680 A.2d 1314 (1996); Cohen v. Cohen, 182 Conn. 193, 202-03, 438 A. 2d 55 (1980); Gagne v.
Viccaro, 255 Conn. 390, 409 (2001); and Cadle Co. v. Gabel, 69 Conn. App. 279, 281-293, 794
A.2d 1029 (2002).[1]

---

[1] The Fourth Count is a cause of action for the imposition of a constructive trust. It is recognized
as its own cause of action, not merely a remedy, and it has its roots in the equitable doctrine of
unjust enrichment. Wendell Corp. Trustee v. Thurston, 239 Conn. 109, 113-14, 680 A.2d 1314
(1996); Cohen v. Cohen, 182 Conn. 193, 202-03, 438 A. 2d 55 (1980). If one were to look to
unjust enrichment as the theoretical underpinning constituting the cause of action for the
imposition of a constructive trust, the law in this state is clear that "a right of recovery under the
doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is
contrary to equity and good conscience for one to retain a benefit which has come to him at the
expense of another." Gagne v. Viccaro, 255 Conn. 390, 409 (2001). Thus, the "cause of action"
here is either one for the imposition of a constructive trust, or one founded upon the equitable
doctrine of unjust enrichment, as a consequence of which a constructive trust should be imposed.

353455                                            2

The other three counts deal strictly with fraudulent transfers of income and property within the four years preceding the commencement of the case. The constructive trust claim is not a suit about fraudulent transfers at all; rather, it is a suit about equitable ownership of property by the Plaintiff's debtors (the husbands of the Defendants) where bare legal title to that property rests in the Defendants. The Plaintiff is asking the court to exercise its equitable power to look behind the legal fiction of title, to the reality of the financial and economic situation, where the Plaintiff's debtors exercise all indicia of ownership over the assets in question but for legal title, such that they truly are the equitable owners of the property. In such a circumstance, equity and good conscience cannot permit the concept of legal title to preclude the Plaintiff from reaching the property (and/or the proceeds thereof) and applying the same towards the satisfaction of the equitable owner's judgment debt to the Plaintiff. Such a claim, which is the constructive trust claim in a nutshell, is very different from a suit at law to set aside a fraudulent transfer. One focuses on the singular event of a transfer; the other focuses on the economics of a family's financial structure over time and the reality of equitable ownership of assets (based upon all of the indicia of ownership other than legal title), with equity refusing to pay homage to the fiction of bare legal title to the detriment of the Plaintiff, and the unjust enrichment of the holder of legal title.

In the prior two briefs, the Plaintiff showed why the claims of the Fourth Count satisfy the essential elements for the imposition of a common law constructive trust. Plaintiff understands that the purpose of this supplemental brief is not to show why the facts alleged and proved in the Fourth Count satisfy the essential elements of a common law constructive trust claim, as such was the purpose of plaintiff's prior memoranda. Instead, this Supplemental Memorandum is restricted to complying to the Court's request that the plaintiff demonstrate why the factual allegations and proof of the Fourth Count do not satisfy the essential elements of the Connecticut Uniform Fraudulent Transfer Act (the "Act"), Conn. Gen. Stat. Sec. 52-552a et seq.

## II.    Argument.

### A. The Murphy & Murphy Transactions.

The transactions and occurrences that collectively comprise the constructive trust claim as to the Murphy & Murphy insurance agency are not the same as a claim under the Uniform Fraudulent Transfer Act. The fundamental premise of this constructive trust claim is the continued, long-term equitable ownership of the stock by the plaintiff's judgment debtors despite their transfer of bare legal title to those shares to their respective wives many years before. This equitable ownership is shown by the following facts (reprinted herein from pages 16-20 of plaintiff's Post-Trial Memorandum):

> There are fifteen paragraphs of stipulated facts bearing specifically on this part of the fourth count (paragraph nos. 17-31 of the Stipulation) and six exhibits

353455

4

(Exhibit nos. 100-105, inclusive, affixed to the Stipulation). In addition, testimony was given by each of the Defendants and each of their respective husbands. The salient facts can be summarized as follows: The Defendants respective spouses, Messrs. Jones and Murren, have been insurance brokers in the insurance business together for many years. As of a point in time not later than the early to mid-1980s, Messrs. Jones and Murren jointly owned, operated, managed and directed Murphy & Murphy, P.C. They each held 50% of the outstanding stock in Murphy & Murphy.

As early as 1990 Messrs. Jones and Murren had serious debt troubles, being indebted to creditors in excess of $2,000,000.00, and which indebtedness was substantially greater than the individual and collective value of their assets. The Plaintiff's assignor commenced suit against Messrs. Jones and Murren on their defaulted loan in 1991, went to judgment against them in 1992 and, in March of 1994, assigned the judgment to the Plaintiff.

On September 1, 1994, a few short months after Messrs. Jones and Murren engineered the transaction that extracted the Van Zant Street property from its foreclosure action and heavy debt burden, and caused that property to be conveyed to JoMur Associates, LLC (all as aforesaid), they continued to have heavy debt problems and, out of a concern that one or more creditors might endeavor to reach and apply their interests in Murphy & Murphy towards their outstanding debts, they each transferred legal title to their fifty percent ownership of the stock of Murphy & Murphy to their respective wives, the Defendants, for no consideration. After the transfer of legal title, just as before, Messrs. Jones and Murren continued to run the company, and together they alone operated, managed and directed the business and affairs of Murphy & Murphy. After the transfer of legal title, just as before, Messrs. Jones and Murren received annual remuneration from Murphy & Murphy at a level roughly equal to the monies available for distribution after business expenses and staff salaries were paid, with each receiving approximately the same amount of remuneration as the other.

From and after the 1994 stock transfers, and up until just before the March 2001 transaction in which the business of Murphy & Murphy was sold to J.M. Layton, the Defendants never received any distributions of dividends, profits or any other payment for or as a result of their shareholdings in Murphy & Murphy,

and neither of them received any significant remuneration from Murphy & Murphy during that time period. In fact, Defendant Grace Jones was never involved in the business of Murphy & Murphy to any extent at all, and Defendant Dorothy Murren never had any meaningful involvement in the business – she never did more than provide a negligible amount of filing and cleaning help from time to time.

Defendant Grace Jones, until her deposition in late 2002, was not even aware that she held legal title to any interest in Murphy & Murphy. Indeed, up until that point in time, she had thought Murphy & Murphy was a partnership owned, operated and managed jointly by her husband and Mr. Murren. Dorothy Murren thought that, at sometime in the past she might have received a transfer of a part of her husband's interest in Murphy & Murphy, but she erroneously believed that he retained legal title to some shares of stock in the company.

Defendants are not and never have been licensed insurance agents or brokers, and both of them lack the knowledge, experience and skill with which to conduct the business of an insurance agency. Neither of them have any knowledge of the business affairs of Murphy & Murphy; nor do they have the ability to compete in the business of insurance.

In late 2000 and early 2001, Messrs. Jones and Murren negotiated an agreement, dated as of January 1, 2001, by which J.M. Layton agreed to purchase all of the assets of Murphy & Murphy, entered into a non-competition agreement with Murphy & Murphy, William Jones, Grace Jones, Thomas Murren and Dorothy Murren, and entered into employment agreements with William Jones and Thomas Murren. In March of 2001, the parties to that agreement closed on the transaction. The agreement for the sale of the Murphy & Murphy assets to J.M. Layton provided for an allocation of the purchase price to said assets, and as a result of said sale and allocation, Defendants Grace Jones and Dorothy Murren each received a $100,000.00 distribution from Murphy & Murphy in March 2001, which distributions were paid to them by checks in the amount of $100,000.00 each. Dorothy Murren's $100,000.00 check, Exhibit 105, went into the aforesaid brokerage account (at PaineWebber) that Mr. Murren set up and oversees (as the financial administrator of their household). Grace Jones' $100,000.00 check, Exhibit 104, went into her aforesaid household account at Chase Manhattan Bank.

353455                                           6

In addition to that lump-sum remuneration, each of the Defendants is receiving jointly with their respective husbands, the sum of $5,000.00 per month for 72 months, from and after January 1, 2001 for said six-year period of time, for a total joint payout per couple of $360,000.00 from those monthly payments.

Post-Trial Memorandum at pp. 16-20.

Plaintiff's judgment debtors remained the equitable owners of the stock through and including the company's sale of its assets to J.M. Layton (the acquiring insurance agency) in 2001. Murphy & Murphy transferred assets to J.M. Layton and, in exchange, J.M. Layton paid Murphy & Murphy reasonably equivalent value for those transferred assets (at least when the financial package, including the monies ostensibly paid for the covenants to not compete, is considered as a whole). Murhpy & Murphy, in turn, remitted the net proceeds of the asset sale to the defendants in the defendants' capacity as the ones who held title to the shares, in essence a purported distribution to shareholders under Conn. Gen. Stat. Sec. 33-687. In addition, J.M. Layton is paying the defendants, jointly with their respective husbands, the sum of $5,000.00 per month, per couple, for 72 months, ostensibly in exchange for a covenant to not compete given by the husbands and wives alike. This is so despite the fact that the defendant-wives do not have the knowledge or expertise to engage in the insurance business in the first place. Their holding of the shares to Murphy & Murphy served as the peppercorn for their joint interest in the covenant payments.

In order for a creditor to recover under the Act, there must be a "transfer" by the debtor of an "asset", as the terms "transfer" and "asset" are defined by Conn. Gen. Stat. Sec. 52-552b (12) and (2), respectively, or, alternatively, an obligation must be incurred by a debtor. Conn. Gen. Stat. Sec. 52-552e and Conn. Gen. Stat. Sec. 52-552f. Further, the transfer must be made by the debtor, or the obligation must be incurred by the debtor, either (1) with an actual intent to hinder, delay or defraud a creditor, or (2) without the debtor receiving a reasonably equivalent value in exchange for the transfer or obligation, where the debtor was either insolvent, or was rendered insolvent by the transfer or obligation.[2] Id. The term "transfer" means

> every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease and creation of a lien or other encumbrance.

Conn. Gen. Stat. Sec. 52-552b (12). The term "asset" means

> property of a debtor, but the term does not include: (A) Property to the extent it is encumbered by a valid lien, (B) property to the extent it is generally exempt under nonbankruptcy law, or (c) an interest in property held in tenancy by the entireties to the extent it is not subject to process by a creditor holding a claim against only one tenant.

Conn. Gen. Stat. Sec. 52-552b(2). The term "property" means "anything that may be the subject of ownership." Conn. Gen. Stat. Sec. 52-552b (10).

---

[2] There is a third legal theory under the Act that is not here applicable, but it too requires a transfer of an asset, or incurring an obligation, by the debtor. See, Conn. Gen. Stat. Sec. 52-552e (2).

The Murphy & Murphy transactions by which plaintiff has been aggrieved do not qualify as transfers of assets of the debtor. Murphy & Murphy sold its assets to another insurance company, in exchange for reasonably equivalent value – i.e., Murphy and Murphy received back from J.M. Layton the proceeds of that asset sale (except for the covenant to not compete component). Murphy & Murphy, in turn, disbursed the net proceeds of the sale, which net proceeds were its assets, to the defendants, ostensibly in their capacity as the titled shareholders, a purported distribution to shareholders.

If plaintiff's judgment debtors had held legal title to the shares when the distributions to their defendant wives were made, plaintiff would have argued that the same constituted an "indirect" transfer of the judgment debtors' property – i.e., that after Murphy & Murphy determined (through the judgment debtors) to make a distribution to shareholders of the net proceeds of the asset sale, and physically allocated those monies to be to be distributed (by making negotiable instruments), the expectancy of a property interest in favor of the shareholders ripened, such that the remittance of the distribution checks to one who was not a shareholder would have qualified as an "indirect" transfer of an asset of the debtors. But, alas, the judgment debtors were not titled shareholders, their defendant wives held title to the shares of the company. Accordingly, the distribution was neither a direct, nor an indirect, transfer by the judgment debtors of an asset. The distributions technically were not the judgment debtors'

property; equitably, the distributions should have been their property, inasmuch as the judgment

debtors were the equitable owners of the company, but due to the artifice by which the

defendant-wives held title to the shares of Murphy & Murphy, the judgment debtors were not

technically the shareholders entitled to the distributions.  Hence, the legal mechanism by which

the plaintiff can reach those proceeds is the imposition of a constructive trust under the common

law.  See, Wendell Corp. Trustee v. Thurston, 239 Conn. 109, 113-14, 680 A.2d 1314 (1996);

Cohen v. Cohen, 182 Conn. 193, 202-03, 438 A. 2d 55 (1980); Gagne v. Viccaro, 255 Conn.

390, 409 (2001); and Cadle Co. v. Gabel, 69 Conn. App. 279, 281-293, 794 A.2d 1029 (2002).

The same holds true for the payments made on the covenant to not compete – they are not

transfers of assets of the judgment debtors.  Those payments have been, and continue to be, made

by J.M. Layton (the purchasing insurance agency) directly to the two sets of husband and wife

couples (jointly to each husband and wife).  The payments are in theory made to the wives so

that they will not compete against the purchaser; yet, they have no capability to compete

irrespective of the covenant.  It is thus, in essence, a deferred compensation component of the

asset sale.  Technically, however, it is not the transfer of an asset of a debtor.  It is a payment to a

non-debtor made in exchange for a covenant to not compete given by that non-debtor.  It is only

when one re-characterizes the transaction into what the payment represents in the economic

marketplace – deferred compensation for the sale of the company's assets – that, in equity, the

353455                                    10

payments should inure to the benefit of the equitable owner of the company. Thus, this component is two layers removed from the Act: it is not technically made in exchange for the asset sale (but for a covenant not to compete), and thus, technically does not purport to be a shareholder distribution. Secondarily, even if it were a shareholder distribution, then the same analysis with the distribution check above pertains.

It should be noted that whether or not the judgment debtors initially held title to the shares of stock (which they did in this case), or if they instead had started the company by placing the stock in their wives' names from the outset, is largely irrelevant to the plaintiff's claim of equitable ownership. The equitable ownership claim is borne out of the spectrum of facts by which the judgment debtors totally and solely organized, managed, operated, controlled, and derived economic benefit from, the company, to the exclusion of the defendants, who had no involvement in the company whatsoever, be it active participation, or even any passive interest other than bare legal title to the shares, as to which shares they had no rudiments of ownership, and made no "exercise" of rights, until the sale of the company's assets many years later. Indeed, that asset sale itself was totally orchestrated by the judgment debtors, and by which they channeled the value of the company's assets to the defendants – value that the judgment debtors created in which was, in equity, "their company", and as to which it is wrongful and unjust for the defendants to have received when the creditors of the judgment debtors have unsatisfied

353455                                    11

debts.  See, <u>Wendell Corp. Trustee v. Thurston</u>, 239 Conn. 109, 113-14, 680 A.2d 1314 (1996);

<u>Cohen v. Cohen</u>, 182 Conn. 193, 202-03, 438 A. 2d 55 (1980); <u>Gagne v. Viccaro</u>, 255 Conn.

390, 409 (2001); and <u>Cadle Co. v. Gabel</u>, 69 Conn. App. 279, 281-293, 794 A.2d 1029 (2002).

**B. <u>The Van Zant Street Property.</u>**

The constructive trust claim with respect to the Van Zant Street Property is not a

fraudulent transfer claim and is, instead, a separate and independent equitable cause of action for

the imposition of a constructive trust.  This claim would not qualify as a fraudulent transfer

under the Uniform Fraudulent Transfer Act, Conn. Gen. Stat. Sec. 52-552a <u>et</u> <u>seq</u>.  The

fundamental premise of this constructive trust claim is the judgment debtors' long-term equitable

ownership of the limited liability company that owns the Van Zant Street Property despite the

holding of legal title to the membership interests in that company by insiders of the judgment

debtors (the defendants herein).  This equitable ownership is shown by the following facts (taken

in part from the Post-Trial Memorandum and in part from the Stipulation, and all of which are

supported in the record):

> There are eighteen paragraphs of stipulated facts bearing specifically on this
> part of the fourth count (paragraph nos. 32-49 of the Stipulation) and ten exhibits
> (Exhibit nos. 106-115, inclusive, affixed to the Stipulation).  In addition,
> testimony was given by each of the Defendants, each of their respective husbands
> and the daughter of the Joneses, Ms. Stacey Schlubach.  A copy of the transcript
> of their testimony is on record with this court.

353455                                                  12

The salient facts can be summarized as follows: The Van Zant Street Property, also known as the Office Condominium, housed the Murphy & Murphy insurance agency from approximately 1986 until August of 2000. The property was acquired in 1986 by J&M Associates, a partnership between William Jones and Thomas Murren, as general partners, for the sum of $700,000.00. In 1987, the property was encumbered by a $600,000.00 mortgage (initially to and in favor of Mechanics and Farmers), which mortgage eventually went into default and, in June of 1992, a foreclosure action of the mortgage was commenced. The mortgage loan was sold during the pendency of the foreclosure action and, in the spring of 1994, William Jones and Thomas Murren struck a deal with the new owner of the mortgage loan to settle the foreclosure action and the mortgage indebtedness underlying the same at a deep discount, for the sum of $112,500.00, a savings of over $500,000.00. At this time William Jones and Thomas Murren were facing serious financial difficulties arising from debts they owed to a number of creditors. They owed creditors collectively in excess of $2,000,000.00 and were in default of their various obligations. They both were then insolvent, and remained so until their respective bankruptcy discharges in October of 2000.

William Jones and Thomas Murren wanted to seize this opportunity to extract the Van Zant Street property from the foreclosure action and the sizeable mortgage debt, but decided that they could not hold legal title, directly or indirectly (i.e., through ownership of a company) without having the property exposed to being reached and applied by their creditors. Therefore, they caused a Connecticut limited liability company to be formed, JoMur Associates, LLC, and placed ownership of the company in the name of Defendant Dorothy Murren (Thomas' wife) and Stacey Schlubach (William Jones' daughter who had worked for her father at Murphy & Murphy for many years, was very close to her father and who, by her own admission, would do anything that her father asked of her, short of committing murder). William Jones was well aware of the closeness of his relationship with his daughter and of her ready willingness to abide by his wishes. Dorothy Murren and Stacey Schlubach each thus became holders of 50% of JoMur Associates, LLC (and collectively held 100% of the membership interests in the company). Thomas Murren was made the manager of the limited liability company and was vested with plenary authority to deal with the sole asset of the company, the Van Zant Street property that was being acquired by JoMur Associates, LLC.

353455                                          13

The settlement with the mortgage holder was consummated in a transaction whereby, as set forth in the Stipulation in paragraphs 41 and 42:

William Jones and Thomas Murren, as J&M Associates, and Jomur agreed that the Van Zant Street Property would be transferred to Jomur in a simultaneous transaction whereby: (a) $100,000.00 of the funds needed to pay to MLQ [the first mortgagee who then owned the loan] would be obtained by a mortgage loan from a third party named Cambridge Associates, with a note for said $100,000.00 to be signed by Jomus Associates, William Jones and Thomas Murren (jointly and severally, as co-makers) and to be secured by a first mortgage to be given on the Van Zant Street Property; (b) title to the Van Zant Street Property would be transferred to Jomur, subject to the Mechanics & Farmers Mortgage and Debt, but which debt was to be discharged by the payment of the $112,500.00 as per the agreement with MLQ.

The aforesaid transaction closed in June of 1994, with the $100,000.00 proceeds of the Cambridge Associates loan being paid to MLQ and with the additional $12,500.00 needed to pay MLQ having been furnished by Murphy & Murphy, and with the following taking place as a part of or as a result of the closing: (a) J & M Associates conveyed the Van Zant Street Property to Jomur; (b) Jomur, William Jones and Thomas Murren (jointly and severally, as co-makers) executed a $100,000.00 note in favor of Cambridge Associates and Jomur granted a mortgage on the Van Zant Street Property in favor of Cambridge Associates as security for the debt evidenced by the $100,000.00 note; (c) MLQ was paid $112,500.00 in satisfaction in full of the Mechanics and Farmers Mortgage and Debt, MLQ released the Mechanics & Farmers Mortgage as an encumbrance on the Van Zant Street Property, MLQ discharged the aforesaid notice of lis pendens, and MLQ withdrew the aforesaid foreclosure action against the Van Zant Street Property; and (d) the Van Zant Street Property was then subject to only a first mortgage in favor of Cambridge Associates in the amount of $100,000.00.

Dorothy Murren did not know that she had an ownership interest in JoMur Associates, LLC (fifty percent or otherwise). In fact, she had never heard of JoMur Associates, LLC, until her deposition was taken in 2002, and she

353455                                                    14

theretofore had believed that Murphy & Murphy owned the Van Zant Street property from the time when Murphy & Murphy moved into it 1986 until sometime in 2000 when the building was sold proximate in time to the sale of the insurance agency itself. Dorothy Murren was also wholly unaware of the financial circumstances with respect to the property; she had never known that the building was in foreclosure or that there was a refinance and conveyance transaction whereby the men resolved the debt troubles of the property.

In 1994, Stacey Schlubach was told by her father that he was giving her a one-half interest in the Van Zant Street property. At the time when she so acquired a one-half interest in JoMur Associates, LLC, Stacey Schlubach had no idea of any of the circumstances surrounding the then-current ownership of the property, did not know who then-owned the property, had no idea of the financial condition of the property – of the delinquent $600,000.00 mortgage in foreclosure, the deep discount settlement offer or any other fact, matter or event relating to the property. She had no idea that she was playing a critical role in her father's and Mr. Murren's extraction of the property from financial difficulty and foreclosure, and that the extraction transaction was being structured so as to remove the property from the reach of Messrs. Jones' and Murren's creditors.

Neither Stacey Schlubach nor Dorothy Murren paid anything of value in exchange for the "acquisition" of their respective 50% membership interests in JoMur Assocites, LLC. Neither of them had anything to do with the management or operation of the property. In fact, there never was a written lease for the property between Murphy & Murphy, as tenant, and JoMur Associates, as landlord. Instead, Messrs. Jones and Murren just structured the lease payments so that they would meet the debt service and tax payments, their estimation for which usually left a little something extra each year that was paid to Stacey and Dorothy.

Such remained the status quo for the Van Zant Street property until early 2000 (nearly six years later), when Messrs. Jones and Murren found a buyer for the property at the contract price of $480,000.00. Neither Stacey Schlubach nor Dorothy Murren were involved in the decision to offer the property for sale, to sell the property or on what terms the property would be sold. They were merely informed of matters as a *fait accompli*. Moreover, at or near the time when a

353455                                                     15

buyer had been found for the property, Stacey was informed that the property was going to be sold and her father, William Jones, asked her to transfer 75% of her membership interest in JoMur Associates, LLC to her mother, Defendant Grace Jones. Stacey readily complied and, for no value (other than her mother's agreement to be bound by the operating agreement), Stacey Schlubach transferred 75% of her membership interest in JoMur Associates, LLC to Defendant Grace Jones on March 8, 2000. Within a few short weeks thereafter, a formal purchase and sale agreement between JoMur Associates, as seller, and the buyer of the property was entered into for the aforesaid sum of $480,000.00.

Grace Jones, until her deposition was taken late in 2002, believed that Murphy & Murphy had owned the Van Zant Street property from the time when it first moved in there until shortly before the insurance agency itself was sold. She was totally unaware of the financial difficulties and circumstance relating to the property, the resolution of those problems (through the transactions above-described) or of any matter, fact or event relating to the property, other than the fact that the property ultimately was sold and vacated proximate in time to when the insurance agency itself was sold. She never was aware that her daughter ever held a 50% interest in an entity that owned the property, that 75% of that interest was transferred to her, or that she received over $146,000.00 in connection with the ultimate sale of the property (she claimed to have no knowledge as to the source of the $146,000.00 payment).

When the contract closed in August of 2000, the net proceeds of the sale were disbursed as follows: $195,820.78 to Dorothy Murren, $146,865.58 to Grace Jones and $48,955.26 to Stacey Schlubach. Dorothy Murren's check went into the brokerage account that Thomas Murren opened in her name (he managed all of the family finances) and which was at his disposal. Grace Jones' check went into the checking account titled in her name that is utilized by the couple for their use in their common life together.

Messrs. Jones and Murren have been insolvent since 1992 and remained so through and including the time when they filed their bankruptcy petitions and received their bankruptcy discharges, and they have no meaningful assets titled in their name.

353455                                                 16

The Plaintiff took examinations of judgment debtors of both William Jones and Thomas Murren in early 2000. Both judgment debtors testified that the Van Zant Street property was bought by them as J&M Associates for approximately $700,000.00, was mortgaged by them and later foreclosed, and then repurchased from the people who foreclosed the mortgage; that the repurchasing entity was JoMur Associates, which was owned by Dorothy Murren and Stacey Schlubach, and that JoMur Associates financed the purchase of the property from the foreclosing mortgagee. Thus, in their debtor's exam, the judgment debtors misrepresented the disposition of the property in connection with the foreclosure action, leading the Plaintiff to believe that the foreclosing mortgagee divested their partnership of legal title to the property, acquiring the property itself, and thereafter re-sold the property to JoMur Associates. William Jones went so far as to claim no real knowledge about any of the particulars of that transaction, claiming that he was not involved in it. Alas, both Messrs. Jones and Murren were intimately involved in that transaction, as they engineered it and guaranteed the "take out" financing and effectuated the conveyance of the property to JoMur Associates directly from their partnership.

See, Post-Trial Mem. at pp. 10-16 and cited provisions in Stipulation of facts.

There are a number of reasons why the factual allegations of the Van Zant Street property transactions do not satisfy the essential elements of a claim under the Act. First, all of the arguments pertaining to the distribution of the net proceeds of the sale of corporate assets by Murphy & Murphy apply to the proceeds of the sale of the Van Zant Street Property with equal force and effect. Jomur sold, to a third party, the Van Zant Street property for reasonably equivalent value – a sum that was more than $370,000.00 above its "acquisition price" of $112,500.00 six years earlier. The net proceeds of that sale were distributed to the defendants as the record holders of the membership interests in Jomur (save for the modest interest retained by

Stacey Schlubach), ostensibly in accordance with their respective percentage interests and rights thereunto under the Operating Agreement (Exhibit 108) and in accordance with Connecticut General Statutes Secs. 34-158 thru 34-161.  Section 34-161 provides that "[a]t a time a member becomes entitled to receive a distribution, the member has the status of, and is entitled to the remedies available to, a creditor of the limited liability company with respect to the distribution."

As with Murphy & Murphy, if the judgment debtors had held the record membership interests and nonetheless caused the company to tender the distribution to their defendant-wives, plaintiff would have claimed that such was an indirect transfer of an asset by a debtor for which recourse may be had under the Act.  But the defendant-wives were the owners of record of the membership interests, such that under the Operating Agreement (Exhibit 108) and the General Statutes cited above, they technically (or facially) qualified as the persons entitled to receive the distribution, and the distribution thus was neither a direct, nor an indirect, transfer by the judgment debtors of an asset.  The Jomur distributions technically were not the judgment debtors' property; equitably, the distributions should have been their property, inasmuch as the judgment debtors were the equitable owners of the company, but due to the artifice by which the defendant-wives held record ownership of the membership interests in Jomur, the judgment debtors were not technically holders of membership interests entitled to the distributions.  Hence, the legal mechanism by which the plaintiff can reach those proceeds is the imposition of a

constructive trust under the common law.  See, <u>Wendell Corp. Trustee v. Thurston</u>, 239 Conn.

109, 113-14, 680 A.2d 1314 (1996); <u>Cohen v. Cohen</u>, 182 Conn. 193, 202-03, 438 A. 2d 55

(1980); <u>Gagne v. Viccaro</u>, 255 Conn. 390, 409 (2001); and <u>Cadle Co. v. Gabel</u>, 69 Conn. App.

279, 281-293, 794 A.2d 1029 (2002).

In large measure it is immaterial whether the initial acquisition of the Van Zant Street

property by Jomur itself constituted an actionable fraudulent transfer under the Act.  Plaintiff's

case does not hinge on the outcome of that question; rather, plaintiff's case is about the judgment

debtors' long-term equitable ownership of the Van Zant Street property (and of the membership

interests in Jomur) despite that artificial transaction, such that it would be unjust and inequitable

for the defendants to retain the proceeds of the sale of the company's real property.  Even if the

initial Jomur acquisition of the Van Zant Street Property were a fraudulent transfer, the judgment

debtors would be no less equitable owners of the property (and of Jomur) than they would be

otherwise, and the diversion of the proceeds (to the defendants) of the August 2000 sale of the

Van Zant Street Property would be no less wrongful and inequitable.  But there is probative

value to that artificial transaction, as the facts and circumstances thereof, and of the judgment

debtors' then precarious financial position, show motive and opportunity to devise and

implement a plan of secret, equitable ownership, of the Van Zant Street property by the judgment

debtors through the Jomur scheme.

Was that initial transfer of the Van Zant Street property by J&M Associates a fraudulent transfer by the judgment debtors of their assets or of their interests in an asset?

The Van Zant Street Property was never owned by plaintiff's judgment debtors. Until June of 1994, the Van Zant Street Property was owned by a Connecticut general partnership known as J & M Associates, the sole general partners of which were the plaintiff's judgment debtors, Messrs. Jones and Murren. It is the general partnership that transferred the Van Zant Street Property to Jomur Associates.

Partnership law changed somewhat in 1995, so we must look to the Connecticut General Statutes as of 1994, when the J&M Associates to Jomur land transaction took place. As we shall see, the conveyance of the real property by the partnership did not qualify as a "transfer" of an "asset" by the judgment debtors, because the transfer was of partnership property and, in 1994, a partner's rights in specific partnership property was not capable of being assigned by an individual partner for his individual purposes, nor was a partner's rights in specific partnership property subject to attachment or execution; instead, the sole vehicle of a creditor of an individual partner to reach an individual partner's interest in the partnership was by means of a charging lien, a judicial procedure that impressed a lien on an individual partner's partnership interest (which is personal property, not realty) and thus gave the judgment creditor the right to receive the distributions of money that otherwise would have devolved to the judgment

353455                                               20